## MARSHALL CLINE v. THE STATE.

### *No. 1324. Decided June 27th, 1896.*

1. **Evidence—Reproducing the Testimony of a Dead Witness—Construction of Statute.**

    The testimony of a witness, who has since died, taken and reduced to writing at an examining trial, under provisions of Art. 267, Code Crim. Proc., cannot be reproduced and used as evidence upon the trial of the defendant for said offense. Such testimony does not come within the purview of the meaning of "depositions," which, under provision of the Code Crim. Proc., Art. 774, are expressly allowed to be thus read in evidence, because, the requisites of, and formalities prescribed for the taking of depositions in criminal cases, are not the same as those required to be observed in taking testimony at an examining trial.

2. **Constitutional Law—Construction of Sec. 10, Bill of Rights, Code of Criminal Procedure, Art. 4.**

    Sec. 10, of the Bill of Rights declares, "that, in all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury," etc. He shall have the right of being heard by himself or counsel or both, shall be confronted with the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor. Code Crim. Proc., Art. 4. Held: The "prosecutions" mentioned mean such as are to be had before a jury—an "impartial jury."

3. **Same—"Confronted With the Witnesses Against Him.'**

    "Confronted with the witnesses against him," as used in Sec. 10, Bill of Rights, means nothing less than on a trial in a criminal prosecution before a jury, the accused shall be confronted with the witnesses adverse to him before that trial jury.

4. **Same.**

    Art. 25, Code Crim. Proc., expressly provides, that, "the defendant upon a trial shall be confronted with the witnesses, except in certain cases provided for in this Code, where depositions have been taken." By intendment and construction the "trial," as here used, means a trial before a jury. And this article is exclusive and excludes all evidence except that of confronting witnesses; and the depositions taken in conformity with law.

5. **Evidence—Rules of the Common Law.**

    The rules of procedure and of evidence known to the common law, have no standing in this State, in criminal cases, where our Codes have provided rules in regard to the particular question. [Code Crim. Proc., Arts. 27, 725, 726,] and the rules of the common law, or the law as it existed at the time our constitution was framed, could not, in the nature of things, and did not enter and become part of that instrument as to its interpretation and construction. See, the opinion for a discussion, in extenso of this question.

#### 6. Right to be Confronted With Witnesses—"Necessity."

The right of an accused to be confronted with the witnesses is a constitutional guaranty, and is not a rule of evidence. It cannot be avoided upon ground of necessity, for necessity that is higher than the constitution can safely have no place in American jurisprudence. That the accused has only been confronted with the witnesses does not satisfy the constitutional demand; he must be confronted by them on the trial before an empaneled jury.

#### 7. Constitution—Rules of Construction "Ab Inconvenienti."

In construing the provisions of a constitution, the rules of construction are, where the words are clear and plain, and the sense perfect and distinct, arising on them, there is no necessity to have recourse to other means of interpretation. The object is to give effect to the intent of the framers. This intent is to be found in the instrument itself; and, when the text of a provision is not ambiguous, courts are not at liberty to search for its meaning beyond the instrument, nor have they the right to add to, or take away from, that meaning. The doctrine, "ab inconvenienti" and expediency does not apply to constitutional provisions. Inability of the State to comply with the law constitutes no excuse for its violation.

#### 8. Same—"Stare Decisis."

The rule of stare decisis, has but little application in criminal jurisprudence, and ought to have none when wrong and tending to overturn the plainly written law. Adjudicated error persisted in cannot make truth of that error.

#### 9. Construction of Sec. 10, Bill of Rights, and Art. 25, Code of Criminal Procedure—Reproduction of Evidence Taken at Examining Trial.

If Sec. 10 of the Bill of Rights means anything, and Art. 25, Code Crim. Proc., is a valid law, then, "testimony," taken at an examining trial, cannot be used as original evidence on a final or any subsequent trial of the case. Overruling, upon this point, Johnson v. State, 1 Tex. Crim. App., 333; Black v. State, Id., 368; Steagald v. State, 22 Tex. Crim. App., 464; Sullivan v. State, 6 Tex. Crim. App., 319, and other similar Texas decisions, and criticising and controverting Mattox v. U. S., decided February 4th, 1895; 15 Sup. Ct., 339.

HENDERSON, Judge, dissenting, Holds: That the testimony of a witness taken on an examining trial or before a jury of inquest, in conformity with law, in all cases where the defendant was present when the testimony was given, and was afforded the right to cross-examine the witness, is a confrontation of the accused with the witness in contemplation of the constitution and the statute upon that subject; and, if such witness be dead at the final or any subsequent trial of the accused for said offense, after a predicate establishing his death has been properly laid, such testimony, taken at said examining trial or before a jury of inquest, may be read in evidence by the State against the accused. This was the rule at common law, as shown by the decisions of the English courts since 1654. That this rule of interpretation and construction of the common law, entered into and was part of the provision in the Bill of Rights of the Constitution of the United States when the provision was inserted in that instrument; and the same rule of interpretation and construction prevails as to Sec. 10 of our Bill of Rights. Before that provision was placed in our Constitution, the words, "confronted with the witnesses against him," had been interpreted and construed in an unbroken line of decisions both in the Federal and State Courts having a similar constitutional provision. There has been no exception to the rule in other States. It has been the rule in Texas since 1871, when the courts were first called upon to announce it. The rule, whether founded upon necessity, justice or interpretation only. is a well established exception to the constitutional and statutory rule. Exceptions to a general rule are never considered violations of the rule itself.

He further Holds· That examining trial evidence is "a deposition," and is admissible under provisions of Art. 814 [774], Code Crim. Proc., on a subsequent trial of defendant, when it is shown that the witness making the deposition has since died

APPEAL from the District Court of Gonzales. Tried below before Hon. T. H. SPOONER.

This appeal is from a conviction for murder in the second degree, the

punishment being assessed at imprisonment for twenty-five years in the penitentiary.

Appellant, together with his brothers, Tom and Dan Cline, was jointly indicted for the murder of Spencer Cunningham, in the County of Gonzales, on the 28th day of January, A. D. 1893. There was a severance, and Dan Cline was first tried and convicted; and his case, on appeal, will be found, as Cline v. State, 33 Tex. Crim. Rep., 482. The case of Tom Cline v. State, will be found in 34 Tex. Crim. Rep., 347. The essential facts in this case will be found in those two cases.

The only question discussed on this appeal, was raised by exception of defendant to the ruling of the trial court in admitting, over his objection, as evidence, the written testimony of one Monroe, taken on the examining trial of this defendant for the murder, the said witness, Monroe, having died since the taking of his testimony at the examining trial.

*Burgess & Hopkins*, for appellant, filed an able brief and argument in the case, and in view of the importance, and great interest of the question involved, and the further fact, that their brief cannot be summarized without marring its strength and harmony, it is reproduced in full, as follows:

We desire to argue our contention, that the use of examining trial evidence taken under the statute is in violation of the 10th Section of the Bill of Rights.

Our first proposition is, that the clear meaning of said section is that at any stage of a "prosecution" when witnesses are used, when evidence is "given, when there is a public trial by an impartial jury," that the defendant must—"shall be confronted with the witnesses against him." In a word, that this right of being confronted by the witness against him, from the reading of the section itself, is a continuing one which is only bounded by the "prosecution." The section reads as follows:

"In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel or both; he shall be confronted by the witnesses against him, and shall have compulsory process for obtaining witnesses in his favor."

Here are four sentences, each reserving to "the accused" certain "rights" in "all criminal prosecutions." All are predicated upon the terms "accused" and "prosecutions." To the accused in all criminal prosecutions these rights are granted. Either right exist only with reference to the prosecution. The scope and duration of either or all is fixed only by the word "prosecution." If there is nothing in the nature of the right itself or in the terms granting it that otherwise limits it, then it continues with the prosecution. The nature of the right granted, for instance; to have a copy of the accusation against him is met by that copy being furnished, but mark you, that right exists with the

prosecution. "He" may at any stage of the prosecution demand it. All of the other rights assured the accused in this section, save the one under discussion, are conceded by the courts to be continuing ones and to last as long as the prosecution does. There is no sort of question about that. The right to "a speedy public trial" lasts till the prosecution ends. The right to not be compelled to give evidence against himself ends only with the prosecution. The right of being heard in person or by counsel or by both continues as long as the prosecution does. Who will deny these statements? "He" is the accused. When and where does he have these rights? "In all criminal prosecutions." Is not this plain? The fourth sentence assures the accused three rights, viz.: the right of being heard in person or by counsel or both, the right of being confronted with the witnesses against him and the right to have compulsory process for obtaining witnesses in his favor. The scope and duration of all three must be the same. To hold otherwise would be to violate all known rules applicable to such a sentence. Smith, Butler, Clark and Blair would be outraged. We call attention to the conjunction "and" in this last sentence. The right of being confronted by the witnesses against him and the right of compulsory process for witnesses in his favor are joined by this "and." We invoke another plain law of language that the one must last as long as the other. This is "strict construction?" No! it is non-construction; it is just simply holding that the people, who made the Constitution, said what they mean and mean what they have said. Any other rule adopted by the courts will, if pushed to its sequence, overthrow this government "of, for and by the people." Now, will the court stop right here and decide this contention of ours? Are we right in saying, that from the terms employed, it is clear that at any stage of the prosecution, where witnesses are used, the "accused" "shall be confronted with the witnesses against him?" Surely it is not too much to ask a court to decide the meaning of a constitutional provision from its terms. This is exactly what no court in Texas has ever done. Mark that! We repeat, that in none of the cases decided on this point, which has repeatedly been raised and decided in the reported cases in this court, has the court hinted even at the meaning of the provision from the language itself. We submit that no one can gainsay our position. That no teacher of the English language of any ability will hesitate to endorse our contention unqualifiedly. We apprehend that the present court will admit directly what the court has admitted indirectly in the case of Steagald, 22 Tex. Crim. App., 490, by saying that "the admission of this class of testimony is solely upon necessity, and the rule as to its admission is an innovation upon the constitutional guaranty that in all criminal cases the accused shall have the right to be confronted with the witnesses against him." By this, the court admits that the Constitution inhibits the practice.

Our next proposition is, that when the meaning of a constitutional provision is clear from the terms employed, all discussion is at an end. That the primary rule with the courts in a question of this sort, is, we

must presume that the people have said what they mean and mean what they say; in other words, that a Constitution is a Constitution. The distinguishing characteristics of American jurisprudence is constitutional interpretation. The law of no other country can touch us on this ground. The common law is of no use at all on a question of this character, and the court that invokes its power as to a constitutional question is, in the slang of the day, "off its base." "The word constitution," says Cooley, "is used in a restricted sense, as implying the written instrument agreed on by the people of the Union or of any one of the States, as the absolute rule of action in respect to all of the points covered by it, which must control it until it shall be changed by the authority which established it." Cooley's Cons. Lim., p. 5. This definition is in full accord with all authority on the subject. Rules as to a thing partake of the nature of the thing to which they apply. This definition of a constitution has given rise to an unbroken line of authority in America as to constitutional interpretation. In the adoption of a constitution the people speak, and the only question is, what do they say? Those rules that apply to statutes and courts, partake of the representative capacity in which they speak, the question being to ascertain the intent of the principals for whom these agents—legislative and judicial—speak. In a constitution the people speak for the avowed and conceded purpose of protecting themselves against any abuse of power of these very agents. The rule of interpretation must, therefore, be the same as that applicable to any other written instrument. Words are signs of ideas as figures are signs of quantity, or all language is valueless. Constitutional government is a farce, a mockery, unless courts will presume invariably that their principals intended just precisely what they have said. This must, in the very nature of things, be the primary rule of interpretation, or rather, there must be no interpretation or construction if the meaning is plain from the terms employed. We find on this question a perfect accord of authority. Story says: "Where the words are plain and clear, and the sense perfect and distinct arising on them, there is generally no necessity to have recourse to other means of interpretation." Story on Con., Secs. 182-4. "The general principle on which we have heretofore insisted, that the meaning of a written law is to be found in its terms, and that we are not at liberty to resort to extrinsic facts and circumstances to ascertain what the framers might have intended, has frequently been declared to apply to the Constitution." Sedgwick on Cons. Con., p. 552, 2nd Ed. Says Chief Justice John Marshall, in Sturges v. Crowninshield, 4 Wheat, 202, 3: "It is well settled that the spirit of a Constitution is to be respected no less than its letter; yet that spirit is to be collected from its words, and neither the practice of legislative bodies nor other extrinsic circumstances, can control its clear language." See, also, Gibbons v. Ogden, 9 Wheat, 188. Judge Cooley quotes in the body of his text with entire approval the following language of Johnson, Judge, in Newell v. The People, 7 N. Y., 9: "Whether we are considering an agreement be-

tween parties, a statute or a constitution, with a view of its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them. If thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning, apparent on the face of the instrument, is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither legislatures nor courts have the right to add to or take away from that meaning." See, also the note on page 71 of Cooley, 6th Ed. These same words are quoted in the body of the opinion of the Supreme Court of the United States, in the case of Board of Lake Co. Commissioners v. Rollins, 130 U. S., 662, without quotation marks, thus making them the language of the court. The opinion is rendered by Justice Lamar, and he elaborates the same fully so as to leave no question of the position, and cites numerous authorities from the Supreme Court of the United States and the various States which sustain him beyond question. Mostly western and northern States. In the southern States no other idea was ever thought of in the opinion of the courts, as any student can easily verify in a moment. This opinion was rendered as late as 1888. There was no dissenting opinion from either of the judges. This is true of the Constitution of the United States, irrespective of the great question of implied powers under the Federal Constitution. If true of that how much more force must the rule have when applied to the Constitution of a State? In the one the people of the States grant power to their agents; in the other they put a limit to the powers of their agents. It seems there is more reason for the strict construction of one of the provisions of the Bill of Rights than any provision of the Constitution of the United States. We call attention of the court to cases cited by Justice Lamar to sustain the text quoted from Newell v. The People. We submit to the court that such is the unbroken current of authority.

Now, if these two positions are true, it follows, as night does day, that the use of examining trial testimony is contrary to the Constitution of the State, and it is not only the province but the imperative duty of the court to so declare.

We desire to consider some of the objections to this position. Some one exclaims, stare decisis! We think that a limited doctrine, and frankly, one for which we confess we have no very profound respect. If the question were one involving real property rights, and a matter of decision alone or the construction of a statute affecting real property, or the interpretation of a Constitution where the meaning is not clear from the terms employed, then proper consideration should be given to former judicial opinion. Surely in such a question as the one under discussion, the reason for a stare decisis not existing, the rule

should have little force. We are of course aware that Johnson's case, 1 Tex. Crim App., 333, and Black's case, 1 Tex. Crim. App., 368, and Sullivan's case, 6 Tex. Crim. App., 319, are against this position, and we desire to examine briefly the reasoning of the court in each case. In the Black case, there is no reasoning. It simply cites a few cases and "holds" the action of the court below was not error. In the Johnson case the opinion is rendered by Judge White, for whose learning we have the greatest respect, and in the Steagald case in the 22 Tex. Crim. App., 490, he says himself of the reasoning in the Johnson case, that the admission of such testimony is an innovation on the Constitution, grounded upon necessity! In neither of the Texas cases, or of those of other States which we have been able to examine, does the court discuss either of the propositions upon which we rely to sustain our contention. The terms employed in the section of the Bill of Rights are not commented on with a view of ascertaining the meaning of the section. Thus the first and primary inquiry with reference to the constitutional question, according to all authority, is ignored in these opinions, and secondary modes of interpretations resorted to, or to be precise, interpretation is resorted to, when, "it is not allowable to interpret what has no need of interpretation." Vattel. Liv. 11, Chap. 17, Sec. 262. This will not be questioned by any one who will examine the cases. The process of reasoning by which the position announced by Judge White, supra, is reached is that such was the practice at common law even prior to the passage of statutes expressly authorizing it; that we have such statutory enactments; that in civil and criminal cases the rule is the same; that we have adopted the common law of evidence by express statute, and "that from a very early period the practice has been sanctioned by an unbroken line of decisions, both in England and in this country. It has been received ex necessitate, being the best evidence the circumstances of the case would admit of"—Judge White in Johnson's case, pages 342-3—and "is admitted as a sort of of judicial neccessity."—Judge Winkler in Sullivan's case, page 342. The same process is followed by Judge Winkler in the Sullivan case, and he gives the same basis for it, viz: necessity. We are only surprised that two such patriotic and talented judges as these, upon coming to such a conclusion as to the reason of the admission of the testimony, did not with emphasis repudiate it for that very reason. An innovation may be made upon a State Constitution upon the ground of necessity! That necessity is fixed by the legislature of that State, and the highest judicial tribunal of that State gravely sanction and approve such a doctrine. We deem this a terrible doctrine, destructive of constitutional government, contrary to the genius and spirit of a republic, and without sanction in any respectable authority that treats of the American theory of government. It launches us upon a boundless sea without compass or chart, and in the control of our agents. Who shall judge of a necessity great enough to make an innovation on a constitution solemnly adopted by the vote of the people in whom all paramount

power, as Calhoun so often used to say, resides: the principals—the people who made it—or the agents—the legislatures and courts—of those principals? What think you Jefferson, Madison and that host of patriotic statesmen who pledged their lives, their fortune and sacred honor to the establishment of this form of government, would have said of such a proposition? What will the ending be? "Necessity," like the word "reasonable" is one for the people and not courts and legislatures. To make necessity a ground for abrogating a provision of the constitution, is to give the delegated agents of the people power to rule contrary to the expressed will of the people. If the people think a necessity exists great enough to cause an "innovation" on the constitution, doubtless they would adopt an amendment to it. If they have said what they do not mean, let them unsay it! The very definition of a constitution as given by all courts and writers on the subject of American constitutions, excludes all idea of "innovation," "abrogation," or any change whatever from the clear import of the words in which the makers of the constitution have expressed themselves. There is dynamite in this idea of innovating upon the Constitution. Another may object to our position, and say, three Constitutions have been adopted in this State containing similar language, and the last one was adopted after the legislature and courts of the State had given a different construction to this section of the Bill of Rights, and hence the people are to be presumed to have adopted it with the understanding and intent that that construction was the idea conveyed. That very question was decided in our favor by Chief Justice John Marshall in Sturges v. Crowninshield, cited above, and is the leading case on that question. There is no exception to the primary rule, that the "framers of the Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said." Marshall in Odgen v. Gibbons, 9 Wheat 1, 188. And it is only where there is doubt as to the meaning of the terms employed, that recourse to prior and cotemporaneous legislative and judicial action can be looked to as guides to interpretation. C. & O. Ry. Co. v. Miller, 19 W. Va., 408; Hamilton v. County Court, 15 Mo., 3; Ex parte Jackson, 14 Blatch, 245; People v. Potter, 47 N. Y., 375; Dean v. Reid, 35 U. S., 524; Beardstown v. Virginia, 76 Ill., 34; 6 U. S., 358; 99 U. S., 72, and cases herein cited under second proposition.

This is the unbroken current of authority. Another may say that such a construction of the Constitution would lead to such results, that the people would with one voice exclaim against it. Well, in the first place, there is no construction in this view, but simply holding that the people mean what they have said, and if they don't like it, they can change their expression whenever they see fit. In the second place, what the people might say is rather an argument aimed at the "backbone" of the court than at its brains, and is unworthy the notice of any court. Let us stand by the organic law of our State if the people should "howl." If there is anything in this objection it is in that word, "re-

sults." What has the court to do with the result of the operation of a provision of the Constitution? This is but another subterfuge or excuse for an "innovation on the Constitution." It is the cry ab inconvenienti, so fully condemned by Cooley, Story and Sedgwick. See, Cooley, pp. 81-7. Chief Justice Bronson (3 N. Y., 547) says: It is highly probable that inconveniences will result from following the Constitution as it is written. But that consideration can have no force with me. It is not for us, but those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of government. Written constitutions will be more than useless. Believing, as I do, that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be avoided or some good to be attained by pushing the powers of government beyond their legitimate boundary. It is by yielding to such influences that constitutions are finally undermined and overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process."

These are brave and patriotic words, and, methinks, in accord with the genius and spirit of this the greatest government under the sun. If they are true, they are more than that, they are as eternal as the present form of this government. Of course, it goes without saying, that they are also authority on all of the positions taken in this argument.

But one other position remains to be noticed. Being by the weight of authority and the force of logic driven from all the others some might plant themselves on the statute, Article 25, and say it authorizes in express terms the use of this character of testimony. It does most unquestionably. But what of that? The constitution is the parent, the statute is the child. One commands; the other can only obey. What effect does this article have on the question we are arguing from the 10th Section of the Bill of Rights? No more than the color of our hair, or the sex of the person that stole our corn last night. So far as we have been able to investigate, no court has ever held that the legislature—even a Texas legislature—can fix a construction on the constitution, or enlarge or decrease its provisions. This court has held in Powell v. State, 17 Tex. Crim. App., 345, expressly the reverse. The legislature may increase the rights granted to accused by the Bill of Rights, but it cannot decrease them; hence, if our positions herein taken are correct, so much the worse for the legislature. The ignorance of that body on constitutional law will simply be demonstrated again. "It has oft been before, and may be again." If, on the other hand, we are

wrong in our contention as to the 10th Section of the Bill of Rights, then the statute clearly limits the State "upon a trial" to confronting the defendant with the witnesses except in cases provided for in the Code, where depositions have been taken. That this refers to a final trial in the District Court is clear from the fact that these depositions, which are excepted out of the "confronting," can only be used in that court. Even without that "clincher" it clearly means that from the words "upon trial." Then that statute conflicts with the one which authorizes dying declarations. But, as that question is not in this case, we will leave that vexed problem for consideration at some future time. But we cannot leave this view of the subject without calling attention to the fact, in our opinion, that to hold that this article increases the rights of the "accused," under the Bill of Rights, logically means, that in the absence of the statute, under the Constitution, the accused would have practically no rights as to the production of witnesses against him, and the legislature might enact any law it pleased as to the character of evidence that the State could introduce, and the times of Jeffries might again be thrust upon us. If it increases his constitutional rights, if it were repealed, what rights would he have? If, by the force of Article 25, only the State is limited to the use of depositions taken under the Code, to what would the State be limited if its force were revoked by the repeal of the law? Fall back on the force of the 10th Section of the Bill of Rights? What force has it as applied to a final trial, if there be anything in the statute? If only once, in an examining trial, where no one is that finally passes on the credibility of the "witnesses," and the weight to be given their testimony; where everything is done in the rudest manner, and by the most incompetent public servants, and all are more or less under the influence of the populace, the defendant is confronted with the witnesses against him, then the constitutional right is at an end, the bulwark of the "bulwark"—jury trial—is thrown down forever, and the State may pour in upon the defendant any evidence it pleases. Whither are we tending in this experiment in self-government on the Western continent? What will the ending be? In strict construction, not only of the constitution, but of the statutes, also, we submit, lies the only hope of this "republic of republics." The last hope of the people now is in a noble, upright, unswerving, patriotic and learned judiciary, that will stand with them against the encroachments of national and State power, and steer the ship of state in accordance with the only safe pilot—individual sovereignty. We ask the court to bear with us in this somewhat long argument. Our only apology is, that we feel we are right, and that the question involved strikes deep in the foundation of that government that we love, and to which we give our deepest devotion.

It appears that the case was orally argued by the parties, the Assistant Attorney-General representing the State. The written brief and argument of the Hon. Mann Trice, Assistant Attorney-General, were

filed in connection with a motion for rehearing, which was made by him after the opinions below had been handed down. And, as they present the State's view of the case, they are also reproduced in full at this. point.

The motion for rehearing is as follows:

### MOTION FOR REHEARING.

Now comes the State, by attorney, and moves the court to set aside its judgment of reversal rendered herein, and grant it a rehearing for the reasons following:

1. Because the court erred in holding that the introduction in evidence of the testimony of a witness taken on the examining trial of the defendant was violative of Section 10 of the Bill of Rights, in this: It appears from the record herein, that the defendant was present and represented by counsel when said witness was examined before the examining court, and that the defendant did then fully cross-examine said witness, and that all of his testimony was reduced to writing and duly sworn to by said witness before the examining court, and the same was properly authenticated by the court and proved up by him when the same was offered in evidence against the defendant on final trial. The occurrence of the above facts rendered the testimony of said witness admissible, regardless of Section 10 of the Bill of Rights. The language there used, "shall be confronted with the witnesses against him," had a well-defined and fixed judicial meaning at the time, and long before the adoption of our present Constitution; and by a long line of decisions theretofore rendered, it was held that where a defendant was present and had the opportunity of cross-examining the witness against him, and afterwards before the final trial said witness died, became insane or was kept away by the adverse party, that his testimony so taken could be reproduced and introduced on the final or any subsequent trial of the case. See, Mattox v. U. S., 156 U. S. Rep., 237; Simmons v. State, 5 Ohio. Stat., 325; Brown v. Com, 73 Pa., 321; Bishop's Crim. Proc., 520 and 527; Whar. Crim. Law, 667; Phillips on Ev., Vol. 2, 217 and 229; Kendricks v. State, 10 Humph., 479; U. S. v. McCumb, 5 McLean, 286;. Pope v. State, 22 Ark., 371; O'Brien v. Com,, 6 Bush, 563; Com. v. Richards, 18 Pick., 434; People v. Murphy, 45 Cal., 137; People v. Devine, 46 Cal., 45; Davis v. State, 17 Ala., 354; Mosler v. State, 67 Ala., 55; State v. Johnson, 12 Nev., 121; State v. Hooker, 17 Vt., 658; State v. Elliott, 90 Mo., 350; State v. Fitzgerald, 63 Iowa, 268; State v. Fredric, 69 Me., 400; Cooley's Const. Lim., 6th Ed., 387.

As before stated, the terms, "shall be confronted with the witnesses against him," before their use and adoption in our Constitution, had received their meaning and significance from judicial decisions. The presumption, therefore, prevails that the framers of our Constitution used said language in its legal sense, and that they were fully apprised of the legal significance of said terms. It is well settled that where terms or phrases having a technical or fixed judicial meaning, that the law makers.

or the framer of the organic law, when using said terms or phrases, use them according to their legal significance as distinguished from any construction that might otherwise be placed upon the language.    See, Cooley's Const. Lim., 6th Ed., 74.

2.    The court erred in even considering the question upon which this case is reversed, for that the same is not raised by a proper bill of exceptions.    The purported bill of exceptions is fatally defective, in this: It is not stated therein upon whose examining trial the testimony objected to was taken, the names of the witnesses, or even the testimony, is not set forth in the bill, and for aught that appears from said bill of exceptions, the testimony introduced may have been wholly irrelevant and immaterial, and not of sufficient importance to cause a reversal of the case.

Said bill of exceptions is as follows:    "Be it remembered, that upon the trial of the above cause, the State offered to introduce the written examining trial testimony, to which defendant at the time objected, because such evidence was contrary to the 10th Section of the Bill of Rights in the State Constitution, which objection was overruled by the court, and the State was permitted to introduce and read to the jury the said testimony, to which defendant at the time excepted, and here tenders his bill of exceptions, and prays same to be made a part of the record of this cause."

This is the most defective, incomplete and unsatisfactory bill of exceptions that I have ever seen incorporated in a record, and just the character of a bill of exceptions that this court has heretofore uniformly refused to consider.

George Burgess, Esq., who resides in Gonzales, Gonzales County, Texas, appears to be counsel of record for appellant, and it is respectfully asked that a copy of this motion be served upon him in accordance with the rules in such case made and provided.    ·

For the errors above indicated, it is respectfully submitted that a rehearing should be granted.

*Mann Trice*, Assistant Attorney-General, on motion for rehearing by State.—1.    If a bill of exceptions be necessary in order to present a question for decision on appeal, then the purported bill of exceptions in this record is not sufficient, notwithstanding the statement of facts discloses the testimony objected to.    Art. 724, Code Crim. Proc., New Code, and authorities there cited, under note 6, renders it clear that the bill of exceptions to the admission or rejection of testimony in the trial of a case, is necessary to raise the question on appeal. And while it is true the evidence admitted over defendant's objection may be embraced in the statement of facts in connection with the evidence objected to, this does not relieve the appellant from raising the question by bill of exceptions, which should specifically state the grounds of objection, and sufficient testimony to show the materiality or immateriality of the testimony admitted.    The bill in the present case does

not even give the name of the witness whose testimony was admitted, or indicate upon what examining trial, or state anything further than the grounds of objection. Should the bill be considered in this form, in my judgment, it would be tantamount to a disregard of the inflexible rule, that the question should be presented by a bill, or else considered waived.

2. Reference to adjudicated cases show that the court, in its opinion in holding that the term deposition, used in Art. 774, Code Crim. Proc., is to be understood in the technical sense of a deposition in civil cases, is error. From the caption, or key to, of Art. 774, "testimony taken before an examining court may be read," etc., when considered in connection with the language of the act, it is obvious that the term "deposition," and the term "testimony," are used as interchangeable, convertible and synonymous terms, and that the term "deposition," there used, is not the technical deposition referred to in the preceding articles. This is made manifest by reference to decisions other than the Kerry case. In Clark v. State, 28 Tex. Crim. App., 195, the testimony of one Churchill was reduced to writing upon the examining trial, and he afterwards died, and the testimony was offered in evidence, and the defendant objected because the justice's certificate was insufficient. It was there held that no particular form for such certificate is prescribed by law in such cases. Other objections of a similar nature, where it was objected that the magistrate did not write his name across the seal of the envelope containing the testimony as required by law, held not to be well taken, because there is no particular rule prescribed under Article 774. On this point see, Golden v. State, 22 Tex. Crim. App., 1; Kirby v. State, 23 Tex. Crim. App., 13; O'Connell v. State, 10 Tex. Crim. App., 567; Martinez v. State, 26 Tex. Crim. App., 91; Byrd v. State, 26 Tex. Crim. App., 375; Crook v. State, 27 Tex. Crim. App., 198.

All conclusively show that the courts have never regarded the word "deposition," in the technical sense, as it is treated in this opinion.

The court pretermitted a discussion of the rules applicable to dying declarations, res gestæ, etc. But if this decision is to be followed, dying declarations would be clearly excluded. While dependant upon statute, dying declarations are not technical depositions. The court lay stress upon Art. 25, of the Penal Code, which provides, "the defendant upon trial shall be confronted with the witnesses, except in certain case provided for in this Code where depositions have been taken;" therefore, if the reasoning of this court is to be adopted as the law of this State, no testimony, save the technical depositions referred to in the opinion could be admitted upon the trial. This construction appears to me to be erroneous, especially in view of the language used in Section 26 of the Code, viz: "All the provisions of this Code shall be liberally construed, so as to attain the objects intended by the legislature, the prevention, suppression and punishment of crime." Such construction should be given to the different articles of the Code as accords with its general objects and purposes, and which will give full effect to all its

provisions, general as well as special, so they may stand and operate in harmony. See, Cochran v. State, 24 Tex. Crim. App., 394; Ex parte Porter, 16 Tex. Crim. App., 321; Bautsch v. City of Galveston, 27 Tex. Crim. App., 342.

The decision in this case, in my judgment, violates this well known and positive rule of statutory construction.

3. The court erred is holding that Section 10 of the Bill of Rights in plain and explicit language requires the witness to confront the defendant on each separate or successive trial, pending to criminal prosecution. Said section reads as follows: "In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him; and shall have compulsory process for obtaining witnesses in his favor." The terms, "shall be confronted with the witnesses against him," is the language under consideration. This court assumes that this means he shall be confronted upon each and every trial. The clause does not so say, but it is left open for construction as to whether the language in the sense used means confronted pending the prosecution or confronted upon each successive trial pending the prosecution. This being the case, resort must be had to established rules of construction. Invoking the rule of prior and contemporaneous construction, I confidently rely upon a rehearing—for by an almost unbroken line of decisions before and since the adoption of our Bill of Rights, practically the same language there used and language of similar import has been construed to mean, that when the defendant has been once confronted with the witnesses against him and afforded the right of cross-examination and the. testimony given reduced to writing, and properly authenticated, in case of the death of the witness pending the prosecution, it may be used on the final or any subsequent trial of the same case. See, Lummons v. State, 5 Ohio Stat.; 325; Anthony v. State, 4 Miegs (Tenn.), 205; Kendricks v. State, 10 Humph., 479; State v. Tilgham, 11 Iredel, 513; Com. v. Richards, 18 Pick., 434, and authorities cited in motion.

The presumption therefore prevails that the framers of our Constitution used the language in reference to that construction, and it is the duty of the court when the intent and meaning of the framers of the organic law is so ascertained, to give effect and adhere to the settled and established judicial contruction placed upon the language prior to its use in the Constitution. See, Powell v. State, 17 Tex. Crim. App., 346.

4. The query of the court, "if once confronted, means a compliance with the demands of the Constitution in regard to this right—why not apply the same rule of construction to the sections of the Bill of Rights," is sufficiently answered by the circumstances surrounding such case, viz: death of the witness, after his testimony has been reduced to writing.

No such contingency could arise as to the other requirements, for it is presumable, that until "Gabriel blows his horn," a jury could always be found, compulsory process for witnesses obtained and a copy of the charge furnished. While I do not wish to be understood as placing necessity above the plain provisions of the organic law, I do contend that the section of the organic law under consideration in this case, does not with absolute certainty require the confronting of witness and defendant upon each and every trial pending a given prosecution, and that to so construe this language, the court is forced to interpolate and import language into the particular portion of the section under consideration that is not used, and in reaching the conclusions announced by the court you violate the rule you invoke against interpolation of language in the organic law. Better adhere to settled construction than do this.

*George F. Burgess*, for appellant, replying to the motion of the State herein for a rehearing.—1. As to the merits of the opinion attacked by said motion, I have only to say that the motion but "threshes old straw." The points (?) made by the learned Assistant Attorney-General in this motion were presented by him orally to the court, and, I suppose, he briefed the case. The "judicial meaning" of the "terms," or "phrases," "shall be confronted with the witness," was never an issue in this case. What they mean is clear. The question was, and is, when and where is that "confronting with the witnesses" required by the 10th Section of the Bill of Rights? That question involves the whole section of which the sentence quoted by the Attorney-General as having a fixed judicial meaning, is only a part. While it is true that a word or phrase even may have a particular meaning, given it by the courts, no provision of the Constitution can be held to have a meaning contrary to the plain language of the provision itself. The first inquiry of a court, in passing upon a constitutional question, is, or should be, what says the instrument? If the meaning is clear from the words used, that settles the question. It matters not what anterior legislative enactment or judicial opinion may be, for, "ita est scripta." We have in our printed argument, filed herein, cited the unbroken line of authorities, which sustain us beyond question, that such is the rule of constitutional interpretation. The constitution is the agreement of the people with each other, and the rules as to it are the same as applicable to any other written agreement. This position has not been attacked by the State. Our next position was, that it is clear from the words of Section 10 of the Bill of Rights, that this right to be "confronted with the witnesses" is good during the "prosecution." That the idea of "once confronting" the "accused" with the witnesses being a satisfaction of the right is excluded by the plain words of the section, which gives that right a duration equal to the prosecution. This position has not been directly attacked by the State. On these positions we have rested our case. The court has in both sustained us. Correctly so, too. The meaning of the section has

now, for the first time, been decided by the courts from the terms of the section itself. The cases in this (and so far as we have been able to examine in other States) State, that have held contrary to our contention, and upon which the Attorney-General relies in his motion, have made the common blunder of following the common law cases, and not one of them has discussed the language of the Constitution itself. This blunder of the courts have led them to give many different grounds for their decisions, some at variance with others. Some say the testimony is admitted on the ground of necessity, and is an innovation on the Constitution. Sullivan's case, 6 Tex. Crim. App., 319; Steagald's case, 22 Tex. Crim. App., 490. Some that this could be done in civil cases, and that the rule in a criminal case is the same. Black's case, 1 Tex. Crim. App., 381; Johnson's case, 1 Tex. Crim. App., 333. Some, not of this State, however, that once confronting at any trial is sufficient, and all of the cases quoting from English cases, and uniting in claiming to follow authority. (2) After this case has been argued orally and by printed brief, considered by the court for months, and decided adversely to the State, the alarming discovery is made that the court was wrong in considering the question, "for that the same is not raised by proper bill of exceptions." Incidentally, and perhaps accidentally, the Assistant Attorney-General remarks, "this is the most defective, incomplete, and unsatisfactory bill of exceptions I ever saw incorporated in a record." What a pity it was not seen in time to prevent all this labor by the court. But, with due respect to the Assistant Attorney-General, we submit that he has not read the record carefully. There is nothing in the point he makes on the bill of exception for three reasons, to-wit:

1. The court adds to the body of the bill, "before said evidence was introduced, the death of witness, Monroe, was proved, and that the defendant was present at the examining trial, when the witness, Monroe, was examined, and was represented by counsel, and cross-examined said witness." The testimony being a written instrument, it was not requisite that it should be set out in the bill.

2. No bill at all was necessary, for, in the statement of facts, the examining trial testimony of William Monroe is set out, and, in connection therewith, it is recited: "Here the State offered the examining trial testimony of William Monroe as follows: All objections being waived by defendant, except that same could not be used as evidence, because contrary to the 10th Section of the Bill of Rights." We need not cite cases to show that this raises the point sufficiently without any bill in the record.

3. Lastly, this sort of a question could be raised for the first time on appeal unless the record shows affirmatively that the defendant waived the constitutional right. The Constitution does not give the defendant a right to be asserted or claimed by him, but arbitrarily forbids the use of such testimony. "Shall be confronted" fixes the procedure that the courts are bound to respect. The defendant must himself expressly waive that mandate of the Constitution before the court can permit the

use of the testimony offered, just as in the case of trial in a misdemeanor case by a jury of less than the number fixed by the Constitution. See, Sterling v. State, 15 Tex. Crim. App., 256, and cases there cited. "Nor can his mere silence or failure to object be construed to be a waiver by him." See also, Stell v. State, 14 Tex. Crim. App., 60, and Marks v. State, 10 Tex. Crim. App., 334. This, we submit, would be the correct position even if the record was silent as to any objection by the defendant at the time, but the record in this case—the agreed statement of facts—shows that the constitutional objection to the use of this testimony was not waived at all, but was asserted at the time it was offered by the State as evidence. "All objections being waived by defendant except that same could not be used as evidence, because contrary to the 10th Section of the Bill of Rights," is the recital; hence a constitutional right given the accused has been violated, and this court is called upon to correct that error. The written testimony set out in connection with that recital, shows to the court the great materiality of the testimony, if it were necessary to show the court in addition to the fact that the, Constitution has been violated, that harm has resulted to the defendant, which we do not think is the case, though we know the court has gone a "long ways" down this stream commonly called "error, but harmless." · That is a dangerous current, full of "bars" and "snags," that may wreck finally the noble ship of jury trial. We confidently submit that the motion for rehearing by the State should be promptly overruled.

The State's · motion for rehearing was overruled without a written opinion.

DAVIDSON, Judge.—This conviction was had for murder in the second degree. · The State, over appellant's objection, introduced before the jury the written evidence of one Monroe, taken on the examining trial of appellant under a charge for the same offense of which he was in this case convicted. As a predicate for the introduction of this testimony, the death of the witness was proved. The objection urged was that the accused "shall be confronted with the witnesses against him," as guarantied by Sec. 10 of the Bill of Rights of the State Constitution. The testimony was admitted, presumably under the provisions of Art. 774, Code Crim. Proc. (1879), which reads as follows, to-wit: "The deposition of a witness taken before an examining court, and reduced to writing, and certified according to law, in cases where the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, may be read in evidence as is provided in the two preceding articles for the reading in evidence of depositions." In regard to examining trials, Art. 267, Code Crim. Proc., provides that "the testimony of each witness examined shall be reduced to writing by the magistrate or some one under his direction, and shall be read over to the witness, or he may read it over himself, and such corrections shall be made in the same as the witness shall direct, and he shall then sign the same by affixing his name or mark. All the testi-

mony thus taken shall be certified to by the magistrate taking the same."
All judges of the Supreme Court, Court of Criminal Appeals, District
Courts, County Courts, or Justices of the Peace, are magistrates, and
when holding such examining trials are called "examining courts." Code
Crim. Proc., Arts. 42–63. With reference to depositions, the Code of
Criminal Procedure (Article 757), enacts that, "when an examination
takes place in a criminal action before a magistrate, the defendant may
have the depositions of any witness taken by any officer or officers here-
after named in this chapter; but the State, or person prosecuting, shall
have the right to cross-examine the witnesses, and the defendant shall
not use the depositions for any purpose unless he first consent that the
entire evidence or statement of the witness may be used against him
by the State on the trial of this case." "Depositions of the witnesses
may also, at the request of the defendant, be taken in the following
cases: (1) When the witness resides out of the State. (2) When the
witness is aged or infirm." Code Crim. Proc., Art. 758. "Depositions
of witnesses within the State may be taken by a Supreme or District
Judge, or before any two or more of the following officers: The County
Judge of a county, notary public, Clerk of the District Court and Clerk
of the County Court." Id., Art. 759. "The deposition of a witness
taken before an examining court may be taken without interrogatories;
but whenever a deposition is so taken, it shall be done by the proper
officer or officers, and there shall be allowed both to the State and to the
defendant full liberty of cross-examination." Id., Art. 768. Such
depositions may be taken without interrogatories, and the manner and
form of taking and returning same shall conform to and be governed
by the rules prescribed for taking depositions in civil causes. Id.,
Arts. 762, 763, 768, 769. "And when taken in such examining court,
the deposition shall be sealed up and delivered by the officer or officers,
or one of them, to the clerk of the county having jurisdiction to try the
offense." Id., Art. 771. In order, then, to constitute this character of
evidence a "deposition," the provisions of the statutes authorizing same
must be complied with, for it is only by virtue thereof that such "depo-
sitions" can be taken. It will be seen that there are essential differ-
ences between taking "evidence" or "testimony" and returning same in
an examining trial, and taking a "deposition" before an examining
court. These differences are creatures of statute. "Evidence" on an
examining trial is taken when the truth of the accusation is being in-
quired into, and to determine the question of bail, and by the magistrate
alone, unaided by any of the officers enumerated in Art. 759, Code
Crim. Proc. A "deposition" is taken at the instance of the accused,
and in pursuance of different statutes from those prescribed for examin-
ing trials, and under entirely different rules of procedure. This will
plainly and easily be seen by a casual reading of the cited statutes.
"Testimony" taken on the examining trial is certified by the magistrate
only, not as required in civil cases where depositions are taken, but in a
different manner, and is filed with the District Clerk for purposes stated

in the statute. "Depositions" are taken for the purpose of being used in future trials, when the proper predicate is laid. Code Crim. Proc., Arts. 772, 773. Examining trial evidence could always be taken by the State, under the statute, but "depositions" never, until 1879, by virtue of Article 774. In fact, the evidence taken in examining trials was never authorized by statute to be used in this State by either the accused or the prosecution until 1866, and then it was confined expressly to the accused, and by him, then, only when it was shown that the witness giving the said testimony was dead. This right or privilege has never been accorded the prosecution, unless by virtue of Article 774, supra. In Kerry's case, it was held that the word "deposition," in Article 774, was by mistake used for the word "evidence" or "testimony;" and by this construction the right to use "examining trial testimony" was accorded the State, upon predicate laid, as provided in Art. 772, Code Crim. Proc. And this construction, it was said by the court, "is put beyond all question by reference to the original act of 1866, from which Article 774 was taken." Kerry v. State, 17 Tex. Crim. App., 178. Other cases in this State follow and support this case. The act of 1866 reads as follows: "In all criminal prosecutions, when the testimony of a witness has been reduced to writing, signed and sworn to before an examining magistrate, or before any court, and the witness has died, since giving his testimony, the testimony so taken and reduced to writing may be read in evidence by such defendant, as proof of the facts therein stated, and upon any subsequent trial for the same offense; provided, however, that in all other respects, the testimony of such deceased witness shall be subject to the established rules in criminal cases. In every case the death of the witness must be established to the satisfaction of the court." This statute, it will be seen, has no reference whatever to a "deposition," provided for in Articles 757 to 771, and absolutely excludes the idea that such "testimony" is a "deposition." When the statute was repealed, as was done by the Revised Statutes in 1879, this privilege was withdrawn from even the defendant. Article 774 was added to the Code of Criminal Procedure, upon the recommendation of the revisers in the following language, to-wit: "Title 8, Chap. 8. Of Depositions, etc. No material changes are made, except in the addition of Article 774." Willson's Crim. Proc., p. 13, at bottom of page (Report of Commissioners). This title and chapter have reference exclusively to "depositions." Can it be gathered from this recommendation the revisers intended to substitute Article 774 for the Act of 1866 (2 Pasch. Dig. Art. 6605), or that the legislature did in fact substitute it for said act, by carrying the recommendation of the revisers into effect ? I think not. The language of the revisers is free from ambiguity, and clearly conveys the idea that Article 774 was an addition to the chapter, relating only and exclusively to depositions. The word "deposition" has a well-ascertained meaning as used in the Code of Criminal Procedure, and excludes the idea that "testimony" taken in an examining trial, under Article 267 supra, was intended to be, or is, in-

cluded within that meaning. In using the term "deposition" in Article 774, it was intended to confer upon the State the privilege of taking the character of testimony mentioned, in the same manner and under the same forms and procedure as conferred upon the defendant in similar cases. It employs language only appropriate to this end, and for this purpose. In requiring the deposition, under said Article 774, "to be certified according to law," it evidently meant that the deposition should be taken and certified as when taken by the accused; that is, by the officer or officers mentioned in Article 759, and in accordance with other requirements of the other statutes in regard to depositions. The reasons for this conclusion would be equally as cogent, if not stronger, should it be conceded that the Act of 1866 was repealed by substituting therefor Article 774, because the latter act employs language and terms totally at variance with the former, and excludes the idea that the examining trial evidence provided for in the former act was meant or could have been intended by the terms of the latter act. The word "deposition" has not been used to mean "examining trial evidence" in any legislative act in the Code of Criminal Procedure, in its history, so far as I have been enabled to ascertain. For the first time in this State, Article 774 permitted the State to take depositions in a criminal case for the purpose of using same on some subsequent trial thereof, and it was by virtue of this statute alone that this practice was sought to be introduced into the criminal jurisprudence of Texas by legislation. Depositions in criminal causes were unknown to and unauthorized at common law. Therefore, we could not look to that source for such a rule. Johnson v. State, 27 Texas, 765; People v. Restell, 3 Hill, 289, 296; 3 Russ. Crimes, 464; 5 Met. 412, 427; 1 Chitty's Crim. Law, 585; 1 Bishop's Crim. Proc. (1 Ed.), § 1090, et seq. The "testimony" taken in an examining trial, under the provisions of Article 267, supra, was not a deposition authorized to be taken under the provisions of Articles 751, 771, or 774. I have discussed Article 774 as being within the legitimate creative power of the legislature, and not an infringement of the constitutional provision requiring the accused to "be confronted with the witnesses against him." I therefore think the decision in the Kerry case, supra, is erroneous in holding that the word "deposition" means "testimony" taken on an examining trial, and if this character of evidence can be used by the State at all, it must be taken as a "deposition." In this connection I may further say that this court has not been settled in its opinions in regard to this matter. In reviewing the right of the State to use examining trial evidence of witnesses who, at the time of the final trial of the case, were beyond the limits of the State, this court said: "The admission of this character of testimony rests solely upon necessity, and the rule as to its admission is an innovation upon the constitutional guaranty that in all criminal cases the accused shall have the right to be confronted with the witnesses against him." Steagald v. State, 22 Tex. Crim. App., 464-490. Authorites cited: Johnson v. State, 1

Tex. Crim. App., 333; Sullivan v. State, 6 Tex. Crim. App., 319, 342. If this be true, such testimony was admitted as a "necessity," and not under Article 774. The doctrine of these cases would eliminate said Article 774, whether the Kerry decision be right or wrong, because that statute would be "an innovation upon the constitutional guaranty that in all criminal cases the accused shall have the right to be confronted with the witnesses against him;" and the rule would exist by necessity, "judicial necessity," and not by virtue of the said article. If "deposition" and "examining trial evidence" mean the same thing, and are "innovations" upon the constitutional inhibitions or guarantied rights, it must follow that the statute is void.

I have discussed this statute upon the hypothesis that it is not a violation of the 10th Section of the Bill of Rights, and the legislature is authorized to engraft exceptions upon the provisions; and, having done so, the State must pursue the procedure set out in the statute; and, having failed to do so, the evidence was inadmissible. But I do not believe the legislature is empowered to enact any law authorizing the State to reproduce the evidence of a witness under any state of case, unless the accused has waived his right in some way, because it would be a violation of the Constitution. Section 10 is as follows: "In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him; and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on an indictment of a grand jury.  *  *  *" To render this still more emphatic, the Constitution further ordained, by Section 29, that, in order "to guard against transgressions of the high powers herein delegated, we declare that everything in this Bill of Rights is and shall forever remain inviolate, and all laws contrary thereto, or the following provisions, shall be void." When antagonistic to "these rights," no law or rule of evidence can rightfully stand, and where there is a doubt of the constitutionality of the law, impigning these rights, or apparently impigning them, that doubt should be solved by holding the law unconstitutional. Lynn v. State, 33 Tex. Crim. Rep., 153. And this rule is well settled, and has been followed in this State with singular tenacity, except when the accused is to be confronted with the witnesses against him. Three of these "rights" are enumerated in the same sentence, included between the same grammatical periods, to-wit:  "He [the accused] shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him; shall have compulsory process for obtaining witnesses in his favor." The courts have thus far religiously interfered with any and all encroachments upon the first and third of these rights, but have found many excuses for upholding violations of the other. I am unable to ap-

preciate these reasons, though they have the sanction of great jurists and exalted courts. The principal reasons given in the decisions seem to be based on necessity, the rules of evidence known to the common law; and, having been once confronted with the adverse witnesses, the constitutional requirement has been complied with, and the accused can be thereafter confronted with examining trial evidence, or the oral testimony of such witnesses, reproduced through the mouths of others who may have heard them testify. There are many decisions sustaining one or more of these judicial exceptions. I do not purpose examining these decisions in detail. I have neither the time nor the inclination to do so. They are familiar to the profession. I shall only notice these questions in a general way. The Bill of Rights declares that, "in all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury. He shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him; and shall have compulsory process for obtaining witnesses in his favor. * * *" Who is to be tried? The accused. When? In "all criminal prosecutions." What is the character of this trial? "A speedy public trial." By whom is he to be tried? "An impartial jury." Can there be any want of certainty as to these propositions? I think not. It is too plain for discussion that these "prosecutions" are to be had before a jury—"an impartial jury." Whatever else this provision may mean, it does mean a trial before a jury. Otherwise, these provisions of the Constitution are meaningless, and have an occult or hidden meaning not apparent on the face of the language employed, and which must be sought elsewhere. It is as clear, as positive, as certain, as definite, that the accused "shall be confronted with the witnesses against him in all criminal prosecutions," as it is that he shall have his trial before "an impartial jury," or that he shall have "compulsory process" for his witnesses, or be heard "by himself or by his counsel, or both," or to be tried on an "indictment" preferred "by a grand jury." The "criminal prosecutions" pertaining to one of these rights applies with equal force and cogency to any and all the others. If one right can be satisfied by the accused having once enjoyed it, then I see no reason why each cannot be satisfied in the same way and for the same reasons. "An impartial jury" is not an "examining court." It is not a habeas corpus proceeding, nor is it a rule of evidence known to the common law. To give this expression the meaning intended by the Constitution, the provision under discussion should read as follows: "In all trials before a jury in all criminal prosecutions, the accused shall be confronted with the witnesses against him." The other two clauses in regard to compulsory process for the witnesses of the accused, and his right to be heard by himself and his counsel, are taken in this sense. Speaking of this section of the Bill of Rights, this court said: "Evidently these matters all relate to proceedings in the trial court." Tooke v. State, 23 Tex. Crim. App., 10. This can mean nothing less than that, on the trial in a criminal prosecution, before a jury,

the accused shall be confronted with the witnesses adverse to him. It is unquestioned that "he shall be present" at the trial to confront the witnesses. Why, with equal cogency, are not the witnesses required to confront the accused on that trial? The word "confronted" applies as well to the witnesses as to the accused. Under that term the presence of the accused is required, and there is no apparent reason why it should have a different meaning when applied to the witnesses. How can it be held to require the presence of the accused, and excuse the attendance of the witnesses against him? There must be an accused, and there must be witnesses to confront him. If the accused be absent, and the witnesses present, there could be no trial. There might be a forfeiture of a bail bond, but not a trial of the accused in the "prosecution." If the accused presents himself at the trial, and there are no "witnesses against him," there would still be no trial. Not only so, but an examination of the witnesses cannot be had, even if the accused be only temporarily absent during the trial. Bell v. State, 32 Tex. Crim. Rep., 436, and cited authorities; Rudder v. State, 29 Tex. Crim. App., 262. The Constitution demands the presence of both the accused and the witnessess. The legislature seems to have had the same conception of this provision, for it enacted that "the defendant upon a trial shall be confronted with the witnesses, except in certain cases provided in this Code, when depositions have been taken." Code Crim. Proc., Art. 25. I am assuming that the "trial" specified in this statute (Article 25), means a trial before a jury, and the "witnesses" mentioned are those "against him," though this must be arrived at by intendment and construction. It is not so stated in the statute, nor is this meaning.anything like so clear as that shown by the Constitution. The "trial" of the Constitution is a trial "by an impartial jury," and it is clear to my mind that the law-making power so understood it, if the statute (Article 25) means a trial before a jury by the expression "upon a trial." A "trial" before a "jury" is not a trial before an examining court, or under the writ of habeas corpus. If it be true that the statute refers to jury trials, how much stronger and more cogent is it that the Constitution means a "jury trial." If the expression "by an impartial jury" be supplied by intendment in the statute to convey the idea that a jury trial is there meant, how can the expression "by an impartial jury" be stricken from the Constitution, by interpretation, in order to deprive the accused of the right of being confronted with the State's witnesses? It would, indeed, be a strange rule of interpretation that would permit the elimination of the plain meaning of terms and words used in the Constitution, and yet supply a similar meaning to language in the statute, not so certain in its significance and meaning. I see no room for construction as to the constitutional provision, for it uses words which convey a plain purpose or object. Again, the witnesses alluded to in the statute are not specifically designated; in the Constitution they are. By intendment it may be held that the witnesses against the accused are meant in the statute, but it is not so written in terms. We can only hold it so

by construction, and thus be enabled to reach the conclusion that such was the intention of the legislature. If this is correct, the Constitution and the statute mean the same thing.

One word with regard to the expression, "Except in certain cases, provided for in this Code, where depositions have been taken." What does this mean? By referring to Articles 757–771, inclusive, we find that it means only to authorize the accused to take depositions in an "examining court," or where the witness is absent from the State, or is aged and infirm, under circumstances there specified. When so taken, the accused is required to consent that the State may use the depositions, and the prosecution has the right of cross-examining the witnesses whose depositions are taken. Then, it seems to be clear that the "evidence" taken by a Justice of the Peace on an examining trial is not a deposition. Code Crim. Proc., Arts. 267, 757–771. Such "evidence" is, therefore, not only prohibited by the Constitution, but excluded by the statute. Depositions were unknown to the rules of common law. Therefore we cannot look to that source for any light. Johnson v. State, 27 Texas, 765; People v. Restell, 3 Hill, 289, 296; 3 Russ. Crimes (9th Ed.), 464; 84 Ky., 354. But, if they were, they would be excluded by the statute, because it expressly confines such testimony to depositions taken under provisions of the Code. Code Crim. Proc., Art. 25. The language of Article 25 is exclusive, and requires the accused to be confronted with the witnesses "on the trial," except in cases where depositions are taken under the provisions of the Code. It does not recognize depositions provided by English statutes. Our statute provides: "The rules of evidence known to the common law of England, both in civil and criminal cases, shall govern in the trial of criminal actions in this State except where they are in conflict with the provisions of this Code, or of some statute of the State." Code Crim. Proc., Art. 725. There is no provision of law in our Codes recognizing English statutory depositions. We are confined to common-law rules of evidence when not in conflict with our procedure. It is also enacted that "the rules of evidence prescribed by the statutes of this State, in civil suits, shall, so far as applicable, govern also in criminal actions, when not in conflict with the provisions of this Code or of the Penal Code." Code Crim. Proc., Art. 726. It is further provided by statute that, "whenever it is found that this Code fails to provide a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern." Code Crim. Proc., Art. 27. Then it would follow that no matter of procedure or rule of evidence known to the common law would have any standing in this State, in criminal cases, when our Codes have provided rules in regard to the particular question. If the rule be the same under the statute as at common law, then the statute occupies the territory, and it is a rule in law, as in physics, "that two bodies cannot occupy the same space at the same time," and for this reason the statute must prevail. If they be antagonistic, then, of course, the statute expressly excludes the common

law. So, in either case, the common law must yield. Neither the statute nor the common law can in any event supplant the Constitution. This constitutional provision excludes all rules of evidence, statutory as well as common law, if antagonistic to its letter, meaning or intent. A rule of evidence "known to the common law of England" cannot supplant the statute. Much less can it override and annul the Bill of Rights, even if the legislative power had sought to accomplish that purpose. But this has not been, nor sought to be, done by legislative enactment, as I understand the statute. The error lies in judicial construction. We have our own examining courts; and if testimony taken before these courts are "depositions," then they are admissible, if at all, only under the statute; and if not depositions, they are excluded by Article 25. Authorities above cited.

As I understand the history of legislation in this State, examining trial evidence was never admissible for the State by statutory enactment. In 1866 an act was passed authorizing the use of such evidence by the accused, but then only by proof of the death of the witness who gave it. Pasch. Dig., Art. 6605. But this act was repealed in 1879, and now is but a historical reminiscence, even the defendant being debarred this right or privilege. Therefore, I cannot see how it can be held that "examining trial evidence" is admissible, even under the statute. But I have discussed this previously. The right to be confronted with the witnesses against him is a right guarantied by the Constitution to the accused—is not a rule of evidence. This right begins with and continues throughout the "prosecution," whenever the accused is placed on trial before a jury, as to his presence during every stage of that trial, and is co-extensive with his right to have compulsory process for his witnesses, to be tried upon indictment in felony cases, and to be heard by himself and counsel. These are continuing rights, and cannot be obliterated because once made operative in the course of a given prosecution. That hung juries, new trials, or reversals do not satisfy these requirements, if the accused is again placed on his trial under the same indictment, is conceded as to all other rights save the one at issue, and this by all the authorities. Then, why not so as to this provision? If it is otherwise in this instance, and this provision be an exception, it should have been specially so provided in the Constitution. But it was not. Then the scope, duration and authority of these provisions are the same, and cannot be otherwise, if we adhere to the plain terms and positive language employed in setting forth this right. If a necessity exists to set aside this right, or any of these rights, in any emergency, it is found outside and beyond the terms of the Constitution, and not in any language therein set forth. It must come from some higher source, to be supplied by the interpreting power. Whence cometh it? It is said that it originated in and comes from necessity; that it is inherited from the common law, and from the fact that the accused has once been confronted with the witnesses against him. Some courts adopt one of these theories; others, another; and some adopt all three, and superadd the

matter of public policy, as a sort of "roseleaf to the brimming goblet." "Necessity" has afforded a broader ground, perhaps, then the other reasons for the decisions admitting this class of evidence. It has its origin, of course, in the idea that the Constitution must be relaxed in some way in order to admit this character of evidence. Necessity that is higher than the Constitution can safely have no place in American jurisprudence. That principle is necessarily vicious in its tendency, and subversive of the Constitution. It should be, and is, limited by the constitutional inhibitions. This is the settled rule in this State, except, perhaps, in regard to confronting the accused with the witnesses for the prosecution. Lynn v. State, 33 Tex. Crim. Rep., 153; Ex parte Garza, 28 Tex. Crim. App., 381; Ex parte Sundstrom, 25 Tex. Crim. App., 133; Bohmy v. State, 21 Tex. Crim. App., 597; Flood v. State, 19 Tex. Crim. App., 584. The exception referred to is supported by Johnson v. State, 1 Tex. Crim. App., 333; Black v. State, Id., 368; Steagald v. State, 22 Tex. Crim. App., 464, and other cases. These decisions sustain this exception principally upon the broad ground of necessity, but admit that this "necessity" is an innovation upon the constitutional guaranty "that in all criminal cases the accused shall have the right to be confronted with the witnesses against him." Steagald v. State, 22 Tex. Crim. App., 468–490. In Sullivan's case, it was admitted on the ground of "judicial necessity." 6 Tex. Crim. App., 319–342. Why should the necessity exist as to this, and not as to the other provisions? The reasons are not obvious. But, if correct, these decisions establish the proposition that there is a necessity higher than and beyond the Constitution, and out of which this rule must come. Being correct, that necessity must govern and control the Constitution. If it in fact exists, the judiciary, legislature and executive owe it allegiance, and must conform to its behests. As its boundaries have not been and cannot be settled, because of a want of controlling authority, it follows that each department may exercise its high functions as may seem to it proper, guided alone by its own will, or its determination of the emergency which may call it into existence. The judiciary may take one view of it, the legislature another, and the executive still another, and each antagonistic to and subversive of the other. Thus each of these co-ordinate departments may find "necessities" outside the organic law, destructive of the authority of the other two and of that law itself. If this "necessity" exists, the Constitution ceases, and the necessity usurps its place and functions, and becomes a "higher law," to be exercised at the pleasure of the department assuming the existence of the necessity. If the courts can assume it for one reason, they may do so for any number of reasons, and until all of the provisions of the Constitution are nullified, and its existence terminated; and hence the extinction of the courts themselves, or the establishment of their complete and absolute autonomy, independent of the Constitution. The power to create a necessity superior to the Constitution necessarily implies and carries the authority to supersede it. The Constitution, and a controll-

ing necessity antagonistic to its requirements, cannot exist. One must yield, and this, of course, must be the necessity, though some decisions hold the other way. These decisions, in my judgment, are erroneous, and should not be permitted to stand. But this character of evidence is said to have been admissible at common law, and therefore admissible with us. If it be conceded that it was permitted at common law, it does not follow that it is so here. While the English practice may have admitted depositions in criminal cases, this seems to have rested on statutes, and it cannot be easily shown from the cases that parol evidence of what was sworn on a previous trial was used upon a subsequent trial. People v. Sligh, 48 Mich., 54; 11 N. W. Rep., 783, and authorities cited. In that case it was further said: "It must be confessed, also, that although the English practice has always been to allow depositions of deceased witnesses in ordinary criminal cases, a contrary rule seems to be recognized in treason cases, upon the ground that there the statutes provide—as they nowhere else provide, but as our Constitution provides in all cases—for confronting prisoner and witnesses on the trial." See, also, 1 Hale, P. C., 306, 586; 2 Hale, P. C., 286; 3 Russ. Crimes 9th Ed., 437, and note a; Fost. Crim. Law, 236, 328; 1 Chitty, Crim. Law, 585. This practice, in England, is founded and rests upon statutes. Those who maintain a common-law rule assert that, if the accused has once been confronted, the evidence of the witness may be reproduced, if he is dead, insane, kept away by the adverse party, or is too infirm to be able probably ever to attend the trial. If this proposition is correct, this clause of the Constitution should read as follows: "The accused shall be confronted with the witnesses against him, except where he has once been so confronted, and the witnesses have died, become insane, have been kept away by the adverse party, or are too infirm to probably ever be able to attend the trial." If such is the meaning of the Constitution, very singularly inappropriate language was employed to convey that meaning, and we must seek elsewhere than the terms of that instrument for its meaning. I am cited to the recent decision by the United States Supreme Court in the Mattox case, 15 Sup. Ct., 340, in which it is said: "We are bound to interpret the Constitution in the light of the law as it existed at the time it was adopted; not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days. of Magna Charta. Many of its provisions, in the nature of a Bill of Rights, are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected." This exception announces some propositions which to my mind are not in harmony with the "spirit" of our government and Constitution, and certainly not. found in the "letter" of that instrument. I do not understand how our Constitution, a novelty in governmental experience and science, wholly unknown to the common law, or the "law as it existed," could be inter-

preted by that law. It is not clear how "many of its provisions, in the nature of a Bill of Rights, are subject to exceptions, recognized long before the adoption of the Constitution," when there was no Bill of Rights to which these "exceptions" could relate. There must be an existing law before there can be exceptions to it. Not only so, but our theory of government is constructed upon a basis fundamentally at variance with the principles of the British government, and is constructed upon the theory that citizenship is the creative power of government, that all governmental authority and power in the States is derived from the people, and that there is no power above the Constitution, except the people who created it. In other words, ours is a constitutional government, in the States ordained by the people, and the Federal Constitution one of delegated authority conferred by the States. How, it may be asked, can the delegated authority of the Federal government be inherited by that government as a British subject? The Federal authority, in all its bearings and extent, is exercised alone by virtue of the terms of the Federal Constitution, and that Constitution is the act of the States. It inherited nothing. Its powers are conferred. It is the creature of the States, not the child of the common law, nor was ever the subject of the British government.

Again, the common law, or "the law as it existed at the time" our Constitution was brought into existence, never conceived of a constitution such as inaugurated in the States or for the Federal government. It would be much more plausible to construe away the freshly-acquired rights of the English "subjects," wrung from King John, and embodied in Magna Charta, by "the law as it existed at that time," than to interpret away, by common law, those rights reserved by our people in their respective Bills of Rights and Constitutions. As Magna Charta reached out for "new guaranties of the rights of the citizen," secured in that memorable struggle of the English people for their liberties, so our Constitution was "reaching out for new guaranties of the rights of the citizen," after the great struggle which gave the American people in the thirteen colonies their independence. Not satisfied with the Magna Charta of English liberty and rights, the American people ordained and instituted a Magna Charta of their own rights and liberties, in the form of written Constitutions, and in them made a forward movement in guaranties of reserved rights, some of which were unknown to the "law as it existed at that time" of their adoption. Allegiance "as British subjects" was renounced, and those rights were declared which conformed to the views of the American people as an independent people. They did not subordinate themselves to the laws of the country from which they had so recently forcibly separated themselves. There is nothing on the face of the Federal Constitution, or that of this State, recognizing the rules of inheritance "as British subjects." Again, if it be granted that the rules of evidence known to the common law were left in vogue at the time of its adoption by a failure of the Federal Constitution to speak of them, then may it not be said that, when the Sixth

Amendment was added to that instrument, it excluded those rules by requiring the "accused to be confronted with the witnesses against him," without qualification or exception? The inclusion of the "confronting clause," minus the four exceptions said to exist at common law, would exclude those exceptions. Sligh's case, supra; 3 Russ. Crimes (9th Ed.) 437, and note a. Texas, however, could not have inherited as a British subject. She came from another source. Her inheritance, if a successful revolutionary child can be forced to take an incumbrance against its will, came from the civil-law source. What of the common law we have is by adoption, not by inheritance, and its standing with us is solely by legislative enactment. Again, it has been decided that, if the accused has once been confronted with the witnesses against him, this satisfies the constitutional demand, and thereafter their testimony may be reproduced without such confrontation. In this event it may be relevant to ask what becomes of the "rules of evidence known to the common law," as well as the rule of "necessity." In regard to this rule it is said, in the Mattox case, that "the substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and in subjecting him to the ordeal of a cross-examination. This the law says he shall under no circumstances be deprived of." This same law, which says "he shall under no circumstances be deprived of meeting the witness face to face," draws no distinction between the first trial and subsequent trials. It guaranties that right in all criminal prosecutions "before an impartial jury." The rights are none the less sacred because there has been one trial. The law does not select the first trial as the place and time of the confronting of the accused with the witnesses. This is judicial selection. Why is this? If once "confronted" means a compliance with the demands of the Constitution in regard to this right, why not apply the same rule of interpretation to those other provisions of Section 10 of the Bill of Rights? What occult reason is there for this difference in the force and operation of those provisions? Why not, upon a subsequent trial, try the accused before the court without a jury, in private, without indictment, deny him process for his witnesses, refuse him the right to be heard by himself and counsel, and try him in his absence? Why were not the "substance" of these constitutional rights preserved to the accused in the advantage of having once enjoyed them, as well as in once seeing the witness "face to face"? The law draws no line of demarkation, but places them on the same plane, and declares they all shall "forever remain inviolate." If the accused's being once confronted by the adverse witness meets the constitutional demand, then it would be unnecessary to bring that witness again to another trial. His evidence could be proved by another who had heard him testify, though the witness then sat in the court room. Why? Because the Constitution has "once" been complied with, and its demand met, and has no further operation in the given case. This is the legitimate outcome of the doctrine under discussion as maintained by those decisions.

At common law, and until Queen Anne's time, the accused in felony cases was not entitled to produce witnesses in his behalf, nor was he permitted to have counsel for his defense. "It is a settled rule at common law," says Mr. Blackstone, "that no counsel shall be allowed a prisoner upon his trial, upon the general issue, in any capital crime, unless some point of law shall arise proper to be debated." 4 Bl. Comm. § 355. Again, he says, "It was an ancient and commonly received practice that as counsel was not allowed to any prisoner accused of a capital crime, so neither shuold he be suffered to exculpate himself by the testimony of any witnesses." 4 Bl. Comm. § 359. "The prisoner was not even permitted to call witnesses, though present, but the jury were to decide on his guilt or innocence, according to their judgment, upon the evidence offered in support of the prosecution." 1 Chitty, Crim. Law, 624, 625. The accused, therefore, at common law, could have no compulsory process for witnesses in his favor. Reyons v. State, 33 Tex. Crim. Rep., 143; Kidwell v. State, 35 Tex. Crim. Rep., 264. No decision that I am aware of has yet laid down the rule that, if the accused has once been heard by himself or counsel, or has had compulsory process for witnesses in his favor, these constitutional rights were for this reason inapplicable to subsequent trials of the same case. Yet these demands are of no higher standing than that which requires the accused shall be confronted with the witnesses against him, or that, having been once enjoyed, the common law rule refusing them could be invoked. Such a ruling would not be in accordance with the due process of law. No rule can be due process of law which ignores legal justice, or which clearly sets at naught the plain letter of the law. We cannot reach the ends of legal justice by setting at defiance those rules prescribed for attaining it. We cannot hope to enforce and preserve the Constitution by setting aside and overriding its plainly written requirements, and violating its imperative demands. It is not right to wrong, and the Constitution is not maintained by overturning it. The three grounds by which it is said testimony of witnesses can be reproduced upon a subsequent trial, without confronting the accused with the adverse witnesses, are at variance with each other. If either be correct, the others, it would seem, cannot be. "Necessity" knows no exceptions, save those imposed by the dispensing power. The common law is said to be limited by four exceptions, and having once confronted the accused with the adverse witnesses fully satisfies the constitutional demand; hence, it ceases to be operative. In some cases, notably the Mattox case, all of these rules are sanctioned, inconsistent as they are. All of them are outside, and beyond, and antagonistic to the Constitution, as well as to each other. The rule of interpretation adopted in the Mattox case is at variance with that followed by our courts, coeval with the existence of the judicial system of ourcountry with reference to the interpretation of the plainly-written terms of constitutions.

Be it rememl.ʲ ᴜd, that the interpretation of constitutions is pe-

culiarly a phase of American jurisprudence. It originated with us. It had no existence elsewhere. It is not subject to "the law as it existed before;" neither, indeed, can be. We get but little light elsewhere, and this is derived from the rule by which written contracts are construed. The common law cannot furnish us the rule, for it did not deal with an American Constitution. Such an instrument was never within the purview of, or contemplated by, its rules—was a stranger to its growth, development, economy, and its philosophy. Mr. Cooley says: "In American constitutional law, the word 'constitution' is used in a restricted sense, as implying the written instrument agreed on by the people of the Union, or of any one of the States, as the absolute rule of action and decision for all departments and officers of the government in respect to all of the points covered by it, which must control until it shall be changed by the authority which established it, and in opposition to which any act or regulation of any such department or officer, or even the people themselves, will be altogether void." Const. Lim., p. 5. The rule of its interpretation seems to be the same as that applicable to a written contract, and, when the language is plain, direct, and certain, its terms alone should be looked to, and resort to extraneous matters should be excluded. This rule of interpretation has obtained, as I understand it, from the inception of our government. Mr. Story says: "When the words are plain and clear, and the sense perfect and distinct arising on them, there is generally no necessity to have recourse to other means of interpretation." Story, Const., §§ 182-184. "The general principle, on which we have heretofore insisted, that the meaning of a written law is to be found in its terms, and that we are not at liberty to resort to extrinsic facts and circumstances to ascertain what the framers might have intended, has frequently been declared to apply to the Constitution." Sedg. Stat. Const. Law (2nd Ed.), p. 552. In Sturges v. Crowninshield, Chief Justice Marshall said: "It is well settled that the spirit of a constitution is to be respected no less than its letter; yet that spirit is to be collected from its words, and neither the practice of legislative bodies nor other extrinsic circumstances can control its clear language." 4 Wheat., 202, 203. In Newell v. People, 7 N. Y., 9, it was said: "Whether we are considering an agreement between parties, a statute, or a constitution, with a view of interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural significance of the words employed, in the order of grammatical arrangement, in which the framers of the instrument have placed them. If, thus regarded, the words embody a definite meaning, which involves no absurdity and no contradiction between the different parts of the same writing, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither legislatures nor courts have a right to add to or take away from that meaning." This rule was again

declared by the Supreme Court of the United States in Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct., 652; hence, has an unbroken array of authority supporting it. In that case the court say:

"We are unable to adopt the constructive interpolations ingeniously offered by counsel for defendant in error. Why not assume that the framers of the Constitution, and the people who voted it into existence, meant exactly what it says? At first glance, its reading produces no impression of doubt as to the meaning. It seems all-sufficiently plain, and in such case there is a well-settled rule which we must observe. The object of construction, applied to a constitution; is to give effect to the intent of its framers, and of the people in adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument. To get at the thought or meaning in a statute, a contract, or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement, in which the framers of the instrument have placed them. If the words convey a definite meaning, which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the legislature have the right to add to it or take from it. Newell v. People, 7 N. Y., 9; Hills v. City of Chicago, 60 Ill., 86; Denn v. Reid, 10 Pet., 524; Leonard v. Wiseman, 31 Md., 201–204; People v. Potter, 47 N. Y., 375; Cooley's Const. Lim., 57; Story, Const., § 400; Beardstown v. Virginia, 76 Ill., 34. So, also, where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. U. S. v. Fisher, 2 Cranch., 358, 359; Doggett v. Railroad Co., 99 U. S., 72. There is even stronger reason for adhering to this rule in the case of a constitution than in that of a statute, since the latter is passed by a deliberative body of small numbers, a large proportion of whose members are more or less conversant with the niceties of construction and discrimination, and fuller opportunity exists for attention and revision of such a character, while constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a State, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is the most likely to be that meant by the people in its adoption. Such considerations give weight to that line of remark of which People v. Purdy, 2 Hill, 31–36, affords an example. There, Bronson, Judge, commenting upon the danger of departing from the import and meaning of the language used to express the intent, and hunting after probable meanings not clearly embraced in that language, says: 'In this way the Constitution is made to mean one thing by one man and something else by another, until in the end it is in danger of being rendered a mere dead let-

ter; and that, too, when the language is so plain and explicit that it is impossible to make it mean more than one thing, unless we lose sight of the instrument itself, and roam at large in the boundless fields of speculation.'" For one, I dare not venture upon such a course. Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power will prove a failure. "Words are the common signs that mankind make use of to declare their intention to one another; and, when the words of a man express his meaning plainly, distinctly, and perfectly, we have no occasion to have recourse to any other means of interpretation." For additional authorities, see, 3 Amer. and Eng. Ency. of Law, p. 379, note 1. I have thus liberally quoted from this decision because it presents the rule of interpretation applicable to the provision of the Constitution under discussion in the case under consideration. The rule in the Mattox case is inappropriate in a case where the meaning is plain on the face of the instrument. Rules of construction should never be resorted to, nor rules of interpretation invoked, unless a necessity exists therefor; and Vattel says: "It is not allowable to interpret what has no need of interpretation." 76 Ill., 34–40; Cooley, Const. Lim., 55. Again, the proposition is a sound one that courts, in the interpretation of constitutions, have nothing to do with the argument ab inconvenienti, and should not "bend the Constitution to suit the law of the hour." Greencastle Tp. v. Black, 5 Ind., 557, 565; Oakley v. Aspinwall, 3 N. Y., 547, 568. That inconvenience may and will arise from an adherence to the Constitution may be conceded, but this affords no reason for construing away its provisions. It is not for the courts or legislatures to supply these defects. This is for the people who made that instrument. As was said by Bronson, Chief Justice. "If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is declared, the people may well despair of ever being able to set any boundary to the powers of government. Written constitutions will be more than useless. Believing, as I do, that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be obtained, by pushing the powers of government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and the inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the legislature or the judi-

ciary in enlarging the powers of government opens the door for another, which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost, and the powers of government are just what those in authority please to call them." Oakley v. Aspinwall, supra. The evils of such a rule are too obvious to require enumeration or discussion at my hands, and courts should set upon it the seal of judicial disapprobation. Let the people who made the Constitution remedy its defects, as they alone have the right to do. But I do not admit the Constitution is defective in the matter under discussion. The rule of stare decisis has but little application in criminal jurisprudence, and ought to have none, when wrong, and tending to overturn the plainly-written law. May it not be said correctly, in criminal law, in this connection, that adjudicated error, persisted in, cannot make truth of that error? Can any question truthfully be said to be settled until it has been correctly settled? Courts may declare it settled, but those rulings will be questioned and assailed until they are overturned, and the truth is made to prevail. This is right, and it should be so. In criminal jurisprudence, the courts are largely unincumbered with "rules of property rights" involved in the rule of stare decisis. It is error to say that the provision of the Constitution under discussion is a "rule of evidence," and subject to exception, if to be judged by the ordinary rules of interpretation applicable to contracts, couched in plain and unambiguous language and terms. This provision is not a rule of evidence, announces no rule of evidence, but is prohibitory of all rules of evidence contrary to its terms, as well as all matters of procedure violative of its requirements. If this provision of the Bill of Rights means anything, and Art. 25, supra, Code Crim. Proc., is a valid law, then the "testimony" taken on an examining trial cannot be used as original evidence on a final trial of the case, or any subsequent trial thereof. The witnesses against him must confront the accused, or, in a proper case, the "depositions" authorized by the statute can be used; and neither the Constitution nor the statute authorizes the admission of examining trial evidence, but both prohibit its introduction. If such evidence can be admitted at all, under any rule, it would constitute an excuse for not confronting the accused with the witnesses against him. Inability of the State to comply with the law can constitute no excuse for its violation, much less would it authorize an overturning of the constitutional inhibitions. Those cases which hold this character of evidence admissible on the ground that the rules pertaining to the introduction of testimony in civil and criminal cases are the same, in my opinion, are not correct. The Constitution does not require the production of witnesses in open court, in civil suits, as it does in criminal prosecutions, and the statute excludes rules of evidence in civil cases, if in conflict with those prescribed by the Code of Criminal Procedure for the trial of criminal actions. Code Crim. Proc., Art. 726; People v. Sligh, supra.

In view of the fact that the reasons for confronting the accused with

36th Texas Crim. Rep.—23.

witnesses against him have been so often discussed, it would seem use-
less to enter that field and rediscuss them.    For an able exposition of
these reasons, see the strong dissenting opinion of Judge Ryland, in the
case of State v. McO'Blenis 2½ Mo., 402, and the very able and exhaust-
ive brief of Mr. Wright, of counsel for the appellant in said cause.    I
do not see how the jury are fully enabled to pass upon the weight to be
attached to the evidence and credibility of the witnesses, unless they
have had the opportunity of seeing them face to face, and hearing them
detail their testimony.    A just verdict in this respect is incidental to
the accused being confronted by said witnesses, and seeing and hearing
them is necessary to a correct weighing of their evidence. . The man-
ner of testifying, appearance, expressions of countenance, evasion, can-
dor, sudden confusion when detected in a fabricated tale or false state-
ment, are as potent in the minds of the jury, and often more so, than
the words used by the witnesses; and yet these things cannot be repro-
duced before the jury, and, if sought to be reproduced might be
excluded, because they would but form the basis for the opinion of the
reproducing witness.    An intelligent and safe conclusion by the jury as
to the credibility of the absent witness would therefore, in such state of
case, be impossible; and a fair verdict on the weight of his evidence
precluded.    It is in all human probability absolutely impossible to re-
produce the testimony of an absent witness, for his excluded demeanor,
during the time he is testifying, is as much a part of his testimony as
the language he uses in detailing his knowledge of the facts stated by
him.    I have not intended to discuss the rules applicable to the admis-
sion of dying declarations, res gestæ, nor what might constitue a
waiver by the accused of the presence of the witnesses against him, nor
where the accused has kept away from his trial those witnesses who are
adverse to him.

*Reversed and Remanded.*

HURT, Presiding Judge, concurs, and will file opinion.
HENDERSON, Judge, dissents.

———

HENDERSON, JUDGE (dissenting).—Appellant was convicted of
murder in the second degree, and prosecuted an appeal.    The judgment
was reversed by a majority of the court at the Austin term, 1896.    I
dissented from the opinion rendered in the case.    I will now state my
reasons for refusing to agree to that opinion.    A majority of the court
held that the court below committed an error in allowing the State, over
the defendant's objections, to read the evidence of one Monroe, taken
in the examining trial of the defendant on the same charge, reduced to
writing, and properly certified to; the proof showing that, since giving
in his evidence, said Monroe had died.    The appellant objected to this
evidence, on the ground that it was violative of Section 10 of the Bill of
Rights, which guaranties, among other things:  "In all criminal prose-
cutions the accused  *  *  *  shall be confronted with the witnesses
against him."    The court below, following a long line of decisions in

this State, overruled the objection, and admitted the evidence. The appellant saved his bill of exceptions, and now urges the question before this court. As I understand the decision, this court holds—First. That examining trial evidence, taken before a magistrate, and offered on the trial of a defendant in the same case or accusation, where the defendant was present, and had an opportunity to cross-examine the witness, is not a deposition, in contemplation of our statute; that is, that Art. 814 (formerly Art. 774) Code Crim. Proc., 1895, does not refer to examining trial evidence, and authorize its introduction against a defendant on his trial when the witness has died since giving his testimony. Second. That, even if said statute (Article 814) authorizes the use of such evidence against a defendant by its terms, it would be unconstitutional, because violative of Section 10 of the Bill of Rights. As the last proposition goes to the very base of the admissibility of the evidence, I will discuss that first. I beg to suggest in advance, however, that, in a field so thoroughly gleaned by able jurists, it would be arrogant in me to presume to offer any new reasons on the subject. I shall therefore content myself with going over the ground already covered, and citing some of the great number of authorities bearing on this subject, and deduce therefrom the principles established long ago, rendering such evidence admissible, in entire accord with our constitutional provision above quoted. No mention is made of this question in Magna Charta, and it does not seem to have been one of the grievances for which King John's subjects demanded redress, unless it be included in Article 39, which is as follows: "No freeman shall be taken or imprisoned or disseised or outlawed or banished or in anyways destroyed, nor will we pass upon him, nor will we send upon him unless by the lawful judgment of his peers or by the law of the land." However, there can be no doubt it was a part of the common law of Great Britain that, on the trial of a criminal case, it was necessary to confront the accused with the witnesses against him. On a trial a defendant could only be convicted of a crime upon the evidence of witnesses for the crown, and these had to be present, and confront him on the trial. 3 Bl. Comm., p 373; Green, Eng. People, p. 279. This rule, though it has not always been complied with, has never been gainsaid or denied under the British Constitution; but from time to time, as questions arose, rules of evidence were developed in conformity with the above. As exceptions to the general rule, requiring witnesses to speak as to facts directly within their knowledge, hearsay evidence came to be admitted in many cases, such as matters of res gestæ, declarations of co-conspirators, questions of pedigree, dying declarations, etc. State v. McO'Blenis, 24 Mo., 402; 69 Amer. Decs., 435. This kind of evidence was admitted in criminal cases, and, though hearsay in character, was deposed to by witnesses before the jury; the witness testifying, of course, confronting the defendant. And this was allowed notwithstanding the rule that the defendant should be confronted with the witnesses against him. While the rule required the confrontation, it did not propose to regulate what the witness should

testify to when he did confront the defendant. This was regulated by the rules of evidence. And in this connection it was held that. the guaranty of confrontation was satisfied if, at any time during the prosecution, the witness confronted the defendant (see Summons v. State, 5 Ohio Stat., 325); the rule at common law being stated in this wise: "If there has been a previous criminal prosecution between the same parties, and the point in issue was the same, the testimony of a deceased witness, given on oath at the former trial, is admissible on the subsequent trial, and may be proved by any one who heard him give the evidence." See, 2 Russ. Crimes, p. 683; Whar. Crim. Ev., § 627.

To show how the matter stood at common law, I will quote from a few of the old English cases: Buckworth's case (decided in 1654, Mich. term, 20 Car., II.; see, T. Raym., 170), upon this point, is as follows: "Information against Buckworth and others for perjury in ejectment. Defendants justified upon not guilty, and now, upon evidence to prove the perjury, one was produced to prove what one that is since dead swore upon the first trial; and by Kelying, Chief Justice, held: 'It shall not be allowed, because betwixt other parties;' but Twisden and Morton contra, and it was allowed." In Pitton v. Walter (5 Geo. I.; decided in 1718) 1 Strange, 162, Pratt, Chief Justice, said: "The bare producing the postea is no evidence of the verdict, without showing a copy of the final judgment, because it may happen that the judgment was arrested or a new trial granted; but it is good evidence that a trial was had between the same parties, so as to introduce an account of what a witness swore at that trial, who has since died." In Radbourne's case (decided in 1787), 1 Leach, Crown Cases, 457, it is held: "An information before a justice, made by deceased on oath, in the presence of the prisoner, may be given in evidence on the trial, though the informant was not apprehensive of death, and though the information be signed by one magistrate only." In Rex v. Woodcock (decided in 1789) 1 Leach, Crown Cases, 500, Lord Chief Baron Ayre says: "The most common and ordinary species of legal evidence consists in the depositions of witnesses, taken on oath before the jury, in the face of the court, in the presence of the prisoner, and received under all of the advantages which examination and cross-examination can give. But beyond this kind of evidence there are also two other species which are admitted by law. The one is the dying declarations of a person who has received a fatal blow. The other is the examination of a prisoner, and the depositions of the witnesses that may be produced against him, taken officially before a Justice of the Peace, by virtue of a particular act of parliament, which authorizes magistrates to take such examinations, and directs that they shall be returned to the court of jail delivery. This last species of deposition, if the deponent should die between the time of examination and the trial of the prisoner, may be substituted in the room of that viva voce testimony, which the deponent, if living, alone could have given, and is admitted of necessity, as evidence of the fact." In Rex v. Smith (decided in 1817; see, Russ. & R., 339), held: "Deposition of the deceased

held admissible in a case of murder, and though taken when the prisoner was charged with another offense, and although the greater part of it had been reduced into writing during his absence, it appearing that the deceased was afterwards resworn in the prisoner's presence, the deposition then read over and stated by the deceased to be correct, and the prisoner asked whether he had any questions to put to defendant." See, 2 Starkie, 208, and 3 E. C. L., 397. Lord Ellenborough and three of the other judges stated, "that they should have doubted the admissibility of the evidence but for the case of Rex v. Radbourne, 1 Leach, Crown Cases, 457," cited supra. From Reg. v. Beeston (decided in 1855), 29 Eng. Law and Eq., 527, we quote as follows: "The prisoner was charged before a magistrate with wounding A., with intent to do him grievous bodily harm, and A.'s deposition was taken. A. afterwards died of the wound, and the prisoner was indicted for his murder. Held: That, on the trial for the murder, the deposition of A. might be read in evidence. Although it was not on the same technical charge, it was taken in the same case, and the prisoner had had full opportunity of cross-examination. Martin, B., used the following language in said case: 'Our decision is in accordance with the case of Rex v. Radbourne, 1 Leach, Crown Cases, 457, and Rex v. Smith, Russ & R., 339. There is nothing in the statutes to show an intention to alter the common law which rendered the deposition admissible, but I believe that, upon the language of the enactment itself, a deposition would be admissible.' Crowder, Judge, said: 'I think the deposition receivable at common law and under the statute. It appears to me not to have been the object of the statute to restrict the common law. It is not necessary that the charge in the indictment should be the identical technical case charged before the justice.'" In Reg. v. Scaife (decided in 1851; see, 79 E. C. L., 237), the prisoner, Scaife, was indicted, together with Thomas Rooke and John Smith, for larceny. Evidence was given that, by the procurement of Smith, one of the witnesses for the prosecution had been kept out of the way, and her deposition was tendered. The evidence was admitted to be receivable as against Smith, but it was said that it was no evidence against Scaife and Rooke. The case came before the court of queen's bench, and it was held that the learned judge ought to have told the jury that the evidence applied to the case of Smith only, and not to that of either of the other prisoners. Coleridge, one of the justices, said: "I always understood before the late statute that if a witness was dead or insane, or kept away by the procurement of the prisoner, his deposition was admissible, if properly taken." The judges seem to have entertained no doubt as to the admissibility of the deposition as against Smith, who had spirited the witness away. Mr. Roscoe says. "That depositions are admissible as substantive evidence at common law should the witness be either dead (citing Hale, Penal Code, 305; Rex v. Westbeer, 1 Leach, Crown Cases, 12; Rex v. Bromwich, 1 Lev., 180; 1 Salk., 281; Bull, N. P., 242), or be in such a state as likely never to be able to attend the assizes (Rex v. Hogg, 6 Car. & P.,

176; Reg. v. Wilshaw, Car. & M., 145); or if the witness be kept away by the practices of the prisoner (Reg. v. Guttridge, 9 Car. & P., 471)." See, 1 Rosc. Crim. Ev. (8th Amer: Ed.), p. 104 (marg. p. 69).

These cases show the state of the English law on this subject since the year 1654, and show how the courts of common law regarded the rule of evidence with reference to the right of the defendant on a trial to be confronted with the witnesses against him. As the British Constitution, in its unwritten law, contained this guaranty in every jury trial, so our government, national and State, when they came to adopt constitutions, following in the wake of the mother country, placed this provision as one of the guaranties of a defendant in every criminal prosecution. The clause or expression came to us as understood and defined in England; and when Article 6 of the amendment to the Constitution of the United States was adopted, providing "that in all criminal prosecutions * * * the accused shall be confronted with the witnesses against him," the framers of the organic law were advised of the meaning of said clause with reference to the rules of evidence in regard thereto; and, when the Federal courts came to pass on the question, they gave it the same construction as to the reproduction of the testimony of a deceased witness as had heretofore been given to it by the English courts. See, U. S. v. Macomb, 5 McLean, 296, Fed. Cas. No. 15,702; U. S. v. White, 5 Cranch, C. C. 460, Fed. Cas. No. 16,-679; U. S. v. Wood, 3 Wash., C. C. 440, Fed. Cas. No. 16,756; Mattox v. U. S. (decided February 4th, 1895), 15 Sup. Ct., 339. I quote from the latter case as follows: "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury, in order that they may look at him, and judge by his demeanor upon the stand, and the manner in which he gives his testimony, whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of the testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury, which the law has designed for his protection. But general rules of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go Scot-free, simply because death had closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law, in its wisdom, declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused. We are bound to interpret the Con-

stitution in the light of the law as it existed at the time it was adopted, not as reaching out for new guaranties of the rights of the citizen, but as securing to every individual such as he already possessed as a British subject—such as his ancestors had inherited and defended since the days of Magna Charta. Many of its provisions, in the nature of a bill of rights, are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected. A technical adherence to the letter of a constitutional provision may occasionally be carried further than is necessary to the just protection of the accused, and further than the safety of the public will warrant. For instance, there could be nothing more directly contrary to the letter of the provision in question than the admission of dying declarations. They are rarely made in the presence of the accused; they are made without any opportunity for examination or cross-examination; nor is the witness brought face to face with the jury; yet from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility. They are admitted, not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of justice. As was said by the Chief Justice when the case was here upon the first writ of error (146 U. S., 140; 13 Sup. Ct., 50); 'The sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath.' If such declarations are admitted, because made by a person then dead, under circumstances which gave his statements the same weight as under oath, there is equal, if not greater, reason for admitting testimony of his statements which were made under oath. The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination. This, the law says, he shall under no circumstances be deprived of and many of the very cases which hold testimony such as this to be admissible also hold that not the substance of his testimony only, but the very words of the witness, shall be proven. We do not wish to be understood as expressing an opinion upon this point, but all the authorities hold that a copy of the stenographic report of his entire former testimony, supported by the oath of the stenographer that it is a correct transcript of his notes, and of the testimony of the deceased witness, such as was produced in this case, is competent evidence of what he said."

As before stated, a great majority of the States of the American Union, in their Constitutions, have a similar clause to the Sixth Amendment to the Constitution of the United States; and so far as I am advised, without exception, in every State where the question has been presented, it is held that where a witness has once testified against a defendant on the same charge, whether in the examining court or at a for-

mer trial of the case, and has since died, his testimony can be reproduced. See, Roberts v. State, 68 Ala., 515; Pope v. State, 22 Ark., 372; Robinson v. State, 68 Ga., 833; Barnett v. People, 54 Ill., 325; State v. Wilson, 24 Kan., 189; State v. Cook, 23 La. Ann., 347; Com. v. Richards, 18 Pick., 434; People v. Sligh, 48 Mich., 54, 11 N. W. Rep., 782; Owens v. State, 63 Miss., 450; State v. McO'Blenis, 20 Mo., 402; State v. Able, 65 Mo., 370; State v. Johnson, 12 Nev., 121; State v. Valentine, 29 N. C., 225; State v. Staples, 47 N. H., 113; Summons v. State, 5 Ohio Stat., 325; Brown v. Com., 73 Pa. Stat., 321; State v. DeWitt, 2 Hill (S. C.), 282; Kendrick v. State, 10 Humph., 479. The brief of the appellant's attorney and the dissenting opinion of Judge Ryland in the McO'Blenis case, supra, are referred to in the opinion of the court as being an able exposition of the views entertained by the court. In my judgment, the opinion itself in that case is a complete answer to the proposition. I quote from said opinion, as follows: "The people have incorporated into their frame of government, a great living principle of the common law, under which they and their ancestors have lived; and it is the duty of the court so to construe it, as to make it effectual to answer the great purpose they had in view. And this principle, we think, is no other than the principle of the common law in reference to criminal evidence—that it consists in facts within the personal knowledge of the witness, to be testified to in open court, in the presence of the accused. This principle, however, was nowhere written down on parchment. It is not to be found in the Magna Charta or in the English Bill of Rights, but it existed in the living memory of men, and was always a part of the common law, although in bad times it was trodden under foot by bad men in high places. It is not, however, a stiff, unbending rule, extending to every case without exception, falling within its letter, but is limited and controlled by subordinate rules, which render it safe and useful in the administration of public justice, and are as well established as the great principle itself, which, with all its exceptions and limitations, was taken from the existing law of the land, and incorporated into the Constitution. The purpose of the people was not, we think, to introduce any new principle into the law of criminal procedure, but to secure those that already existed as a part of the law of the land from future change, by elevating them into constitutional law. It may as well be the boast of an Englishman living under the common law, as of a citizen of this State living under our Constitution, that in a criminal prosecution he has the right to meet the witnesses against him face to face; and yet it was never supposed in England at any time that this privilege was violated by the admission of a dying declaration, or of the deposition of a deceased witness, under proper circumstances, nor, indeed, by the reception of any other hearsay evidence established and recognized by law as an exception to the general rule. It is said by Lord Aukland, in reference to the conduct of the British courts in the sixteenth and part of the seventeenth centuries: 'Depositions of witnesses, forthcoming if called, but not permitted to be confronted with the pris-

·oner, written examinations of accomplices, living and amenable, confessions of convicts lately hanged for the same offense, hearsay of these convicts repeated at second hand from others, all formed so many classes of competent evidence, and were received as such in the most solemn trials by learned judges." Principles of Penal Law (2nd Ed.), 197. But no complaint of the character of the one now made was ever ·heard. This was not an evil to be provided for by any law, much less by a constitutional provision. These exceptions to the general rule were never considered violations of the rule itself. They grew out of the necessity of the case, and are founded in practical wisdom. The facts thus communicated go the jury, not as entitled to the full faith of the facts sworn to by a witness from his own personal knowlege, but yet ·as competent to be considered by the jury in forming their verdict. But whether these exceptions be wise or unwise, is not submitted to our judgment. They were well established at the time, and, we think, went into the Constitution as part of the great principle of criminal evidence adopted by the clause now under consideration."

In Texas this question first came up in Greenwood v. State, 35 Texas, 588, decided by our Supreme Court in 1871. The charge in that ·case was an assault with intent to murder. One Hampton had testified on a former trial of the case, and before the second trial he died. The lower court, on the subsequent trial, permitted his testimony to be proved by one Lassiter, who heard the deceased witness give in his ·testimony at the first trial. This action of the court was assigned as error, and the question was thus presented. This case was tried before ·the adoption of our present Constitution of 1876, but the clause of the Bill of Rights requiring the confrontation of the accused by the witnesses against him is contained in the same language in every con·stitution under which our people havelived, beginning with the Constitution of the Republic of Texas in 1836. See, Declaration of Rights, Art. 1, § 8; Constitution 1845; Constitution 1866, Bill of Rights, § 8; and Constitution 1869, Bill of Rights, § 8. The court in said case, in discussing the admissibility of the testimony, with reference to the article in our Constitution requiring the defendant to be confronted with the witnesses ·against him, says, that the weight of authority, English and American, is in favor of the admissibility of the testimony;" and a number ^ well-·considered cases are cited, and the court held the testimony a⸍ ⸍ssible. Black's case (see, 1 Tex. Crim. App., 369) was tried in the l⸍ ⸍er court ·at the August term, 1875, under the Constitution of 1869; but the question was passed upon in the Court of Appeals after the adoption of the Constitution of 1876. In that case the defendant was charged with murder. There had been a former trial, and Mrs. Butler, the wife of the deceased, had testified as to the dying declarations of ·her husband. ·She afterwards died, and at a subsequent trial the lower court permitted a witness to testify before the jury, and reproduce the testimony of Mrs. Butler concerning the dying declarations of her husband. This ·action of the court was assigned as error, and the question in all its

bearings was presented to our Court of Appeals. The inadmissibility of this testimony, in view of the provisions of our Constitution, was ably and exhaustively presented by the appellant in that case. Judge Ector, in deciding the case, uses this language: "We think, however, at this time it has generally been declared to be the correct rule of law, both in England and in most of the American States, that the testimony of a deceased witness at a former trial of a criminal charge is admissible at a subsequent trial of the same case, and may be proved by another person who heard that testimony, and he can qualify himself to give it; that in this respect there is no difference between civil and criminal cases, and that the admission of such testimony is not against the provisions of Magna Charta, nor against the provisions of the Bill of Rights, of the first Article, § 8, of the Constitution of the State of Texas, wherein it is provided 'that in all criminal prosecutions the accused shall be confronted with the witnesses against him.' The current of authorities sustain the rulings of the court below in permitting Waters to give the testimony of the deceased witness at a former trial of this case." And he cites a number of authorities, including the previous case of Greenwood v. State, and Johnson v. State, 1 Tex. Crim. App., 333. In Johnson's case, supra, the witness, Addington, testified against Johnson in the examining court; and his testimony was reduced to writing, and properly certified to. Said witness afterwards died. Subsequently the case was tried in the District Court, and the examining trial testimony was introduced in evidence, over the defendant's objections. The point was saved, and the question presented to the Court of Appeals. Notwithstanding the decision in Greenwood's case, supra, the constitutional objections were again urged by appellant to this character of testimony. The court overruled the objection, and admitted the evidence. Our Court of Appeals, in passing on the question, say: "Testimony of the statements of a deceased witness given on a former trial between the same parties, touching the same subject matter, has been admitted among the exceptions to the rule excluding hearsay evidence from a very early period, and has been sanctioned by an unbroken current of decisions, both in England and in this country. * * * The constitutional objection to the admission of such testimony, 'that the accused shall be confronted with the witnesses against him,' has been frequently presented to the courts for adjudication, and is now no longer an open question. The leading case is Com. v. Richards, 18 Pick., 434, where it was decided that the competency of such evidence was not affected by the provisions in the Bill of Rights. The provision of the Bill of Rights of Massachusetts upon which that decision was rendered was substantially the same as that to be found in the present Constitution of Texas (Sec. 10, Art. 1), and the statutory requirement's in Paschal's Dig., Art. 2490." A number of authorities, both English and American, are cited, and the rule laid down in Greenwood's case is approved. These cases have been followed in Texas by an unbroken current of decisions, and the rule never questioned until

the present case arose. See, Potts v. State, 26 Tex. Crim. App., 663; Childers v. State, 30 Tex. Crim. App., 160 (in this case the principle was recognized, but it was held that testimony taken in a habeas corpus trial was not examining trial evidence); Varnell v. State, decided in 1896, unreported; McGee v. State 31 Tex. Crim. Rep., 72; Bennett v. State, 32 Tex. Crim. Rep., 216; Meyers v. State, 33 Tex. Crim. Rep., 204. In the above cases the predicate was the death of the witness. In the following cases the same principle was announced, but the predicate laid was absence of the witness from the State. Sullivan v. State, 6 Tex. Crim. App., 319 (in this case the predicate was that the witness, after diligent search, could not be found in the State; this was subsequently overruled in Evans v. State, 12 Tex. Crim. App., 370); Cooper v. State, 7 Tex. Crim. App., 194; Post v. State, 10 Tex. Crim. App., 579; Garcia v. State, 12 Tex. Crim. App., 335; Evans v. State, Id., 370; Cowell v. State, 16 Tex. Crim. App., 57; Kerry v. State, 17 Tex. Crim. App., 178; Parker v. State, 18 Tex. Crim. App., 72; Steagald v. State, 22 Tex. Crim. App., 464; Conner v. State, 23 Tex. Crim. App., 378; Parker v. State, 24 Tex. Crim. App; 61; McCollum v. State, 29 Tex. Crim. App., 162.

From the vast number of decisions, English and American, on this subject, all one way—in England construing the question at common law, and in America construing the very letter of the Bill of Rights in regard to the reproduction of the testimony of a deceased witness, considered, discussed and followed by an unbroken line of decisions in our own State—it would certainly seem that, if any question could be considered, settled and fixed in the jurisprudence of a State, this should be. I apprehend no one will dare question at this day, that when the amendment to the Constitution of the United States on this subject was adopted, and when the States of the Union adopted that part of their constitutions requiring "in all criminal prosecutions that the defendant be confronted by the witnesses against him," it was done with reference to and having in view the rule on the subject in Great Britain. Nor will it be gainsaid that when our fathers in the Republic of Texas, in 1836, engrafted this provision in their Bill of Rights, and later, when our State came into the Union, under the Constitution of 1845, with the provision inserted in the Bill of Rights that "in all criminal prosecutions the accused shall be confronted by the witnesses against him," this was copied from similar declarations in constitutions of other States of the American Union; and, in so adopting this provision, they considered what was the rule of construction, and what was the interpretation of similar language in the constitutions of other States. Those who formed our republic were, for the most part, from the older States, and it cannot be assumed that they were ignorant of the common law or of the laws and constitutions of the older States, and the same can be said of those who adopted the Constitution of 1845. As early as 1835, when a provincial government for Texas was first organized, in the instrument of organization, Article 7, provides: "All trials shall be by jury,

and in criminal cases the proceedings shall be regulated and conducted upon the principles of the common law of England, and the penalties prescribed by said law in case of conviction shall be inflicted, unless the offense shall be pardoned or fine remitted." The Constitution of the Republic of Texas contains this provision: "Congress shall, as early as practicable, introduce by statute the common law of England, with such modifications as our circumstances and their judgment may require, and in all criminal cases the common law shall be the rule of decision." Article 4, § 13. This was followed by the Act of Congress on the 20th of January, 1840, enacting "that the common law of England (so far as it is not inconsistent with the Acts of Congress now in force) shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by Congress. Pasch. Dig., Art. 978. When our Code was adopted, in 1856, this additional provision on this subject became a part of the law to-wit: "The rules of evidence known to the common law of England, both in civil and criminal cases, shall govern in the trial of criminal actions in this State, except where they are in conflict with the provisions of this Code or some statute of this State." Our Constitution of 1845, was framed by men familiar with the principles of English common law. Many of them had attained eminence in their States before their removal to Texas, and were conversant with their systems of constitutions and laws. This is made manifest by the fact that all of the cardinal principles of our Constitution are but copies from the older States. The provision in question, to-wit: "In all criminal prosecutions the accused shall be confronted by the witnesses against him," etc., is an exact counterpart of that contained in the Constitutions of a number of States, and is substantially similar to that of others; and to say that our Constitution builders were seeking new guaranties for our citizens, not known in the older commonwealths, or were proposing a new experiment, it seems to me, would be attributing to them a degree of ignorance and audacity neither warranted by the work they did, or by the history of those times and traditions that have been handed down to us. Our Constitution builders were lawyers, and they knew what they were doing, and when they said, "The accused shall be confronted by the witnesses against him," they knew how this question had been construed by the English courts, and they knew how it had been construed by the American courts under constitutional provisions similar to ours; and so, in all our constitutions from 1845 up to the present time, this provision has been carried forward in exactly similar language. And, moreover, our Constitution builders, in 1876, and our people who approved their work, knew how this provision had stood in former constitutions, and knew how our own courts, in Greenwood v. State and Black v. State, had construed a former similar provision; and it is a familiar rule of construction that when a statute is adopted from an English statute, or copied from a statute of another State, it is deemed to have been adopted together with the construction placed thereon by the courts of

such State.  See, 23 Amer. and Eng. Ency. of Law, p. 432, and authorities there cited.  "Where the words have been long use'd in a technical sense, and have been judicially construed to have a certain meaning, and to have been adopted by the legislature as having a certain meaning prior to a particular statute in which they are used, the rule of construction requires that the words used in such statute shall be construed according to the sense in which they have been so previously used, although that sense may vary from a strict literal meaning of the words.  *  *  *  In the interpretation of re-enacted statutes, the court will follow the constructions which they received when previously in force.  The legislature will be presumed to know the effect which such statutes originally had, and, by re-enactment, to intend that they should have the same effect.  So, statutes originally enacted in another State, when adopted, are deemed to be taken with the settled construction given them in the State from which they are copied."  See, Suth. St. Const., §§ 255, 256, and authorities there cited.  On this subject Judge Cooley says:  "Great Britain and the thirteen original States had each substantially the same system of common law originally, and a decision by one of the higher courts of Great Britain as to what the common law is upon any point is certainly entitled to great respect in any of the States, though not necessarily to be accepted as binding authority, any more than the decisions in any one of the other States upon the same point.  It gives us the opinions of able judges as to what the law is, but its force as an authoritative declaration must be confined to the country for which the court sits and judges.  But an English decision before the Revolution is in the direct line of authority; and where a particular statute or clause of the Constitution has been adopted in one State from the statutes or Constitution of another, after a judicial construction had been given it in such last-mentioned State, it is but just to regard the construction as having been adopted as well as the words, and all the mischiefs of disregarding precedents would follow as legitimately here as in any other case.  Cooley, Const. Lim., p. 64.  "When a constitutional provision has received a settled judicial construction, and is afterwards incorporated into a new Constitution, or into the Constitution of another State, it must be presumed to have been adopted with the knowledge of that interpretation, and the courts will feel bound to adhere to it."  See, 3 Amer. and Eng. Ency. of Law, 679, and authorities there cited.

In Munsen v. Hallowell, 26 Texas, 475, in speaking of the construction of our statute of frauds, with reference to the statute of limitations, the same being a copy of the English statute, the following language is used:  "Whether the construction here enacted is the one that we should place upon the statute if it was a question of first impression, unaffected by previous judicial opinion, is not now necessary to be determined.  This construction has been settled by a long series of decisions, reaching back in England and America to the time of its enactment.  If, under these circumstances, we were to give it a different

interpretation from that which it has heretofore uniformly received, we think we should with much more propriety be subject to the charge of judicial legislation than when we give it the construction which has heretofore almost invariably been given to it, although its mere letter might lead to a different conclusion." In Morgan v. Davenport, 60 Texas, 230, the principle announced in the previous case is approved, and it is further held that if that part of the borrowed act which caused it to be aided by judicial construction in the government from which it was borrowed, so as to give it a meaning adverse to the common import of the language used, be provided for by the Texas law, of which the borrowed statute becomes a part, then the presumption is that the legislature intended to adopt only so much of the former construction as may be provided for and practically incorporated in the new statute. In Brothers v. Mundell, 60 Texas, 240, it is held "that when the statute of another State is adopted in Texas, the presumption must prevail that the legislature intended to adopt with it the settled construction given to it by the courts of the State from which it was borrowed." This was the case of the construction of a chattel mortgage, under a statute which was similar in its language to that used in the States of New York, New Jersey, Ohio, Michigan, Nebraska, Minnesota, and others; and it was held that, in the adoption of such statutes, we adopted the construction placed thereon by the courts of said States. In Trigg v. State, 49 Texas, 645, it was held "that the Constitution of 1876, in Section 24, of Article 5, in adopting the provisions of a former constitution for removals by the District Judge, and extending same to other officers, is considered to have adopted the judicial construction put upon the powers of the District Judge, and may be regarded as an authoritative adoption of the summary remedy, as it has been previously construed and acted upon by the Supreme Court in Gordon v. State, 43 Texas, 338." Nor are we lacking in authority upon this point in the decisions of this court. In Huntsman v. State, 12 Tex. Crim. App., 619, Judge Hurt, speaking for the court as to the construction of the word "indictment," uses this language: "What is meant by the term 'indictment,' as used in this clause of the Constitution? How are we to ascertain its meaning? Does it mean anything which may in the future be provided by statute? Or does it mean precisely what was understood by the term 'indictment by a grand jury' in the country and in the judicial and legislative parlance at the time the Constitution was adopted? That the affirmative of the latter question is true, needs no authority in this late date to satisfy the legal mind." He then cites from provisions of the Code of Criminal Procedure to show what was meant by indictment when the Constitution was adopted, and then quotes from Judge Roberts, in Hewitt v. State, 25 Texas, 725, as follows: "At the adoption of our Constitution, and for a century previous, both in England and America, this is what was understood as constituting an indictment." "And, again," he says, "the Constitution did not stop to define this term. They used it as a term well defined and under-

stood." And, in Powell v. State, 17 Tex. Crim. App., 345, Judge White, in discussing the meaning of the term "jeopardy," as used in our Constitution, expresses himself thus: "But the legislature has no authority to interpret or declare a matter of constitutional construction; nor can it set aside a construction of the constitutional provision which has become fixed and settled by judicial construction. With regard to its own enactments, the rule is that, 'as the legislature cannot set aside the construction of the law already applied by the courts to actual cases, neither can it compel the courts for the future to adopt a particular construction of a law which the legislature permits to remain in force. To declare what is or has been is a judicial power; to declare what the law shall be is legislative. One of the fundamental principles of all our governments is that the legislative power shall be separate from the judicial.' Before their use and adoption into our Constitution of 1845, the terms 'former jeopardy' had received their meaning and significance from judicial decisions. * * * As before stated, however, the meaning of the term 'former jeopardy' has, in our opinion, been fixed long before the words were used in the Constitution. * * * This construction of the term 'jeopardy' in our Constitution being the proper one, as settled by the decisions of the courts before the Constitution was adopted, it is to be presumed that the word was used in that sense when our Constitution makers put it into the Constitution."

These authorities not only show that our Supreme Court, in Greenwood's case, and in Black's case, were required to adopt and follow the construction (as they did) placed on said provision of the Bill of Rights in regard to the confrontation of the accused by the witnesses against him, as placed thereon by the courts of the American States, but after the decisions in Greenwood's and Black's cases, which reengrafted the same interpretation that had been placed upon the Bill of Rights by other States—after the adoption of the Constitution in 1876—our Court of Appeals was doubly bound to follow the interpretation placed upon this provision of the Bill of Rights, not only by the courts of other States, but by those of our own as well. This, as has been seen, was done in a great number of cases. So much for the construction of Section 10 of our Bill of Rights. But it is urged that the testimony offered in this case was examining trial evidence, and that such evidence is not a deposition; so that, even if our Bill of Rights authorized the reproduction of the testimony of a deceased witness, said statute relating to depositions does not cover examining trial evidence. Our statutes authorizing depositions in criminal cases are to be found in our Code of Criminal Procedure of 1895, from Article 797 (formerly 757) to Article 814 (formerly 774), inclusive, and also Article 24 (formerly 25). Article 814 is as follows: "The deposition of a witness taken before an examining court or a jury of inquest, and reduced to writing, and certified according to law, in cases where the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, may be read in

evidence, as is provided in the two preceding articles for the reading in evidence of depositions." Article 24 is as follows: "The defendant upon trial shall be confronted with the witnesses, except in certain cases provided for in this Code, where depositions have been taken." I might content myself with simply citing the decisions of this court in Johnson v. State, 1 Tex. Crim. App., 333, and Kerry v. State, 17 Tex. Crim. App., 178. Johnson's case was decided in 1876, before the passage of Article 814, which was passed in 1879. At the time of the decision there was in existence a statute passed in 1866. See, 2 Pasch. Dig., Art. 6605. Said statute was as follows: "In all criminal prosecutions where the testimony of a witness has been reduced to writing, signed, and sworn to before an examining magistrate, or before any court, and the witness has died since giving his testimony, the testimony so taken down and reduced to writing may be read in evidence by such defendant as proof of the facts therein stated, upon any subsequent trial for the same offense; provided, however, that in all other respects testimony of such deceased witness shall be subject to the established rules of evidence in criminal cases. In every case death must be established to the satisfaction of the court." It was contended in said case that the statutes only authorized the use of depositions by defendants, and excluded an appeal to the common law for the introduction of examining trial evidence on behalf of the State. The question was thoroughly discussed, and it was held that said statute did not even confer a new right upon the defendant, but merely placed in positive form a right which he already possessed, and left the rights of the State in the same condition as before its passage; and that the right to reproduce the testimony of a witness taken on an examining trial, and since deceased, was a right possessed by the State at common law; and the rules at common law, being authoritative in this State, when not in conflict with the provisions of the Code, could be appealed to here. See, Code Crim. Proc., 1895, Art. 763. And the court, further discussing the statutes of Philip and Mary on the subject of examining trial evidence, substituted by 11 and 12 Vict., quoting from Mr. Archibald, uses the following language: "Although the statutes relating to the examination of witnesses against a prisoner before a Justice of the Peace previously in force contained no such express enactment as the above, it was yet determined in many cases, and recognized as a rule of law, that in all cases of examinations of witnesses in cases of felony, under these statutes, where they were taken in the presence of the accused, and he had the opportunity of cross-examining them, the deposition of any such witness might be read in evidence against the accused on his trial in case the person who made the deposition was dead." See, also, 1 Bishop's Crim. Proc., § 1093. And Coleridge, Judge, says: "Before the enactment of 11 and 12, Vict., Chap. 42, I always understood the law was that, if a witness was absent by reason of death, the deposition was receivable in evidence against him,"—citing, Reg. v. Scaife, 2 Denison, Crown Cas., 281–286, 17 Q. B., 238. The

evidence in said case was held admissible. Kerry's case was decided by this court in 1884, after the enactment of Article 814, and construed said article to authorize the introduction of examining trial evidence, stating, however, that the legislature, in said article, had used the word "deposition" by mistake for the word "testimony" or "evidence." In the latter observation, however, I do not concur, but believe it was the proper term. The word "deposition," in its broadest sense, is defined to be "the evidence of a witness taken down in writing, and sworn to before an officer." See, 5 Amer. and Eng. Ency. of Law, 581. "In procedure, 'depositions,' in the most general sense of the word, are the written statements, under oath, of a witness in a judicial proceeding. It is in this sense that the term is used when we say that, where a witness is dead, his depositions at a former trial are admissible in evidence on a subsequent trial between the same parties." See, 1 Rap. and L. Law Dict., 376, citing Pow. Ev., 183. Mr. Roscoe, Mr. Wharton, and Mr. Phillips all treat examining trial evidence under the head of "Depositions." Examining trial evidence was called a "deposition," and it does not matter that depositions were unknown to the common law. If we get the name "deposition" applied to examining trial evidence, then we have authority for our legislature to so term such testimony.

I do not deem it necessary to enter into a discussion of Article 814, in connection with the other articles of our Criminal Code of Procedure regarding depositions; in order to show that said Article 814 was not intended merely to be supplementary to the statutes authorizing depositions for defendants, but is an independent statute, authorizing the use of depositions for the State. A reference to said article and to the other articles of the Code, I believe, will clearly demonstrate this. Judge Hurt, in Post v. State, decided in 1881 (see, 10 Tex. Crim. App., 579), stated the correct rule which would govern in cases where the evidence had been taken before an examining court, to-wit: "If the deposition is taken before an examining court or a jury of inquest, and is reduced to writing, and certified according to law, and the defendant was present when such testimony was taken, and had the privilege afforded him of cross-examining the witness, and, since the deposition was taken, the witness has died, or has removed beyond the limits of this State, or has been prevented from attending the court through the act or agency of the defendant, or by the act or agency of any person whose object it was to deprive the defendant of the benefit of the testimony, or if, by reason of age or bodily infirmity, such witness cannot attend, the deposition is admissible. This rule has reference to depositions taken before examining courts." In Kerry v. State, supra, the construction of this statute (Article 814), was settled in a clear and convincing opinion.

I would further suggest, in this connection, that said article was enacted in 1878, was construed in 1881 and 1884, and, when it was re-enacted in 1895, came to us with a definite and fixed meaning and construction, and included in that construction examining trial evidence. Said article marks the only contingency in which the actual presence of

the witness is dispensed with on the trial, and is based on Article 25, which requires the accused to be confronted with the witnesses against him in all trials, except where depositions are authorized.   This article is held in accord with the Constitution, upon the theory that the Constitution requires a confrontation of the witness with the accused in every criminal prosecution, and that this is satisfied when the witness, at any stage of the prosecution, has confronted the defendant, and been examined as a witness before a competent tribunal, and the defendant has had the privilege of a cross-examination.   In all other cases there must be an actual confrontation of the accused by the witness; but, when he has once confronted the accused, what he shall testify is regulated by the rules of evidence.   Both, upon reason and authority, it occurs to me that examining trial evidence is a deposition, and that it is admissible on a subsequent trial of the defendant, where it is shown that the witness making the deposition has since died.

Recurring to the interpretation of our constitutional provision on the subject of confrontation of the accused by the witnesses against him, in my judgment it is immaterial how this interpretation grew up or came about.   Whether founded upon necessity, like a great many rules of evidence, which appear to be exceptions to general rules, or whether, in accordance with the provision of the Constitution, it was construed that, the witness once having confronted the accused, and been subjected to a cross-examination, the constitutional provision was satisfied, or whether the Constitution merely proposed to require a confrontation of the accused by the witness, but did not propose to regulate what the witness should say when once confronted, but left this to the rules of evidence, is now of no importance.   It has become the settled law of the land, and to uproot or destroy it, it occurs to me, will be fraught with grievous results.   This construction of the Constitution, in connection with the rules of evidence, has the sanction of the great lawyers and of great jurists, both in England and in this country, whose decisions form an unbroken current in support of the rule we have adopted. It has been found efficacious in the past, enabling courts to preserve and perpetuate testimony against great criminals, and bring them to justice. It is comparatively easy recently, after an offense has been committed, to bring the witnesses together, and, on a preliminary hearing, procure their testimony, and reduce it to writing; and in such case the witness has confronted the defendant, and he has had the privilege of a cross-examination upon all the points of the witness' testimony; and to hold that after the witness has so testified, if, on the next day, he should die, and the State should not be permitted to use his evidence, taken under all of the formalities and sanctity of the law, would be to authorize in many cases the escape from punishment of persons guilty of crime.   It would be resting the administration of the law upon a very brittle thread, and it would be an invitation to criminals themselves to dispose of the testimony against them.   There is too much at stake in the conservation of life and property to deal lightly with this subject.   If the contrary rule

shall prevail, and it shall become the law of this State that examining trial evidence of a deceased witness, or parol evidence given by a witness on a former trial of the case, said witness having since died, cannot be used on a subsequent trial against a defendant, it will not only revolutionize our criminal jurisprudence, but it will be letting down the barriers in favor of criminals, when our Code requires our laws to be liberally construed, in order to suppress crime and bring offenders to justice. If it was important in the early days to preserve this character of evidence, it is equally as important now. Moreover, the same argument so ably and strenuously urged by a majority of this court why this testimony should not be admitted clearly goes to the exclusion of all hearsay testimony, and especially of dying declarations. The same logic by which the result is reached in the one case is also applicable in the other. By our statute, dying declarations are made admissible testimony; yet this is not a confrontation of the witness, in accordance with the construction insisted on by the court. The dead man cannot speak, and cannot confront the defendant; yet, from time immemorial, he has been permitted in the courts, both in England and America, to tell the jury, through the mouth of another (who heard his dying declarations), who killed him, and the circumstances attending the homicide, and often this character of evidence has brought the murderers to justice. It is conceded to be hearsay evidence, but it is admitted on the ground of necessity. It is without an oath, and not made in the presence of the accused, and not subjected to cross-examination. It is admitted as an exception to the general rule of evidence, but the exception is as well recognized as the rule itself. If the opinion of the majority of the court in this case is to become the law of the land, then we are all wrong in admitting this character of testimony. We must exclude dying declarations, because such evidence violates the Constitution. If, on the other hand, we cling to the rule heretofore laid down—that the Constitution in criminal cases requires the witness to confront the defendant, but leaves to the rules of evidence what he shall testify to when he confronts him—the Constitution will be conserved, and we will have no difficulty in the admission of dying declarations. And the same rule will authorize the reproduction of the testimony of a dead witness in other cases. Let us be consistent with ourselves, and, by all means, "let us hold fast to that which is good," and let us not reach out after "new guaranties by judicial reconstruction" (if I may use the expression); especially when these new guaranties are violative of established rules and precedents, which, in the experience of the past, have been found to work for the good of society, and to conserve life, liberty, and property. If, however, the established construction of this provision of our Constitution is to be overturned and trodden under foot, I will utter my protest, and I will set up, as I have endeavored to do, the ancient landmarks of our jurisprudence. If they do not direct our footsteps now, happily they may serve as beacon lights in the future, to guide those who may come after us back into the true path. My breth-

ren have said, "Nothing is settled until it is rightly settled;" and I say that the right was never yet unsettled that it did not struggle to its own again. "Truth crushed to earth will rise again. The eternal years of God are hers."